# Exhibit "B"

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
CASE NO. 13-CV-60384-COHN-SELTZER

RICHARD REMINGTON and URSULA FINKEL,  )
on their own behalf and on behalf     )
of those similarly situated,          )
                                      )
                    Plaintiffs,       )
                                      )
vs.                                   )
                                      )
NEWBRIDGE SECURITIES CORPORATION,     )
                                      )
                    Defendant.        )
                                      )
_____)


DEPOSITION OF GENE ERIC CARASICK

Taken on Wednesday, October 23, 2013

Commencing at 10:08 o'clock a.m.


---oOo---


Taken by the Defendant
Pursuant to Notice

At The Law Offices of Place & Hanley, PLLC
Asheville, North Carolina

Reported by:

Genevieve R. Bata-Slagle, Court Reporter

SPERLING & BARRACO, INC.
Registered Professional Reporters
53 Orange Street
Asheville, NC   28801
(828) 253-2744


SPERLING & BARRACO, INC.



Page 2

```
 1                APPEARANCES
 2   For plaintiffs:
 3       Lyle E. Shapiro, Esquire
         Richman Greer, PA
 4       396 Alhambra Circle
         North Tower - 14th Floor
 5       Coral Gables, Florida  33134
 6       Sara E. Hanley, Attorney at Law
         The Law Offices of Place & Hanley, PLLC
 7       30 Town Square Boulevard - Suite 202
         Asheville, North Carolina  28803
 8
     For defendant:
 9
         Dennis A. Nowak, Esquire
10       Rumberger Kirk & Caldwell, PA
         Brickell Bayview Centre
11       80 S.W. 8th Street - Suite 3000
         Miami, Florida  33130-3037
12
13
14
15                   I N D E X
16   Examination                               Page
17   By Mr. Nowak                              3/63
     By Mr. Shapiro                           60/64
18
19
20                   E X H I B I T S
21   Defendant's Exhibits             Page Marked
22   No. 1                                       3
23   No. 2                                       3
24   No. 3                                      28
25
```

SPERLING & BARRACO, INC.

Page 3

1  PROCEEDINGS
2           (The following document
3            referred to was marked as
4            Deposition Exhibit No. 1
5            for identification.)
6  Whereupon,
7           GENE ERIC CARASICK,
8  called as a witness by the defendant, being first duly
9  sworn, testified as follows:
10      EXAMINATION BY COUNSEL FOR DEFENDANT
11  BY MR. NOWAK:
12      Q. Mr. Carasick, my name is Dennis Nowak. I
13  represent Newbridge Securities Corporation.
14          You're here pursuant to your notice of taking
15  deposition, correct?
16      A. Yes.
17      Q. A copy of which has been marked as Exhibit 1 to
18  your deposition, correct?
19      A. Correct.
20      Q. I've gotten a copy of your expert witness report,
21  which is fairly comprehensive. I will mark it as an
22  exhibit.
23           (The following document
24            referred to was marked as
25            Deposition Exhibit No. 2

SPERLING & BARRACO, INC.

Page 4

1           for identification.)
2      BY MR. NOWAK: (Resuming)
3      Q. Let me ask you if the experience, testimony,
4  background, and all that information that's contained in
5  your expert report is current as of today.
6      A. Is current as of today?
7          There was one document I looked at last night
8  which I hadn't seen before.
9      Q. And what is that?
10     A. That was a document -- it was a response by
11 Newbridge's attorney to a FINRA request for documents, I
12 believe it was. And there were some questions in there
13 too. And so I took a quick look at that yesterday.
14     Q. Is that a request that was made in this case?
15     A. FINRA made the request in connection with their
16 case, yes.
17     Q. All right. I got it.
18     A. So as far as documents is concerned, I believe
19 that's the only one I have looked at since I prepared
20 that report.
21         MR. SHAPIRO: Do you also want to disclose the
22 deposition testimony that you gave recently? Didn't you
23 tell me there was some testimony?
24         THE WITNESS: I'm sorry. I didn't know that was
25 relevant.

SPERLING & BARRACO, INC.

Page 5

1          I gave testimony on Friday in a case in New
2  Hampshire.
3      BY MR. NOWAK: (Resuming)
4      Q. Did it have to do with handling fees?
5      A. No.
6      Q. Let me ask you to take a look at what's been
7  marked as Exhibit No. 2 for your deposition. This is the
8  expert witness report that was provided to me by
9  plaintiffs' counsel, if you'd take a look at it and tell
10 me if that is in fact your expert witness report in this
11 case.
12     A. Yes.
13     Q. And you have told me all of the changes that
14 relate to your report?
15     A. I've told you the documents I've reviewed, yeah.
16     Q. Are there any other changes to your report?
17     A. Well, if I were to do -- I came across something
18 recently that wasn't included in my report that I would
19 use in my testimony, yes.
20     Q. And what is that?
21     A. That is in the AWC that Newbridge signed with
22 FINRA.
23         In the sanction section there is an undertaking
24 -- a long paragraph on undertakings. And in that
25 paragraph FINRA requires Newbridge to specifically

SPERLING & BARRACO, INC.

### Page 6

1  identify any fee or charge that they're making and to
2  characterize it properly and to retain detailed records
3  to demonstrate the manner in which they calculated their
4  cost for purposes of determining what the fee would be.
5  Q. Okay. And that's in the AWC?
6  **A. That's in the AWC.**
7  Q. We'll go over that a little later.
8      Other than that, any other changes?
9  **A. No, I don't think so.**
10 Q. Before we get into your report can you tell me if
11 you've ever been hired to testify as an expert by Place &
12 Hanley other than on this occasion.
13 **A. I'm sorry. Say that again.**
14 Q. Have you ever been hired by the firm of Place &
15 Hanley or any of the lawyers at Place & Hanley --
16 **A. No.**
17 Q. -- to testify as an expert?
18 **A. No.**
19 Q. By Mr. Shapiro at his firm?
20 **A. No.**
21 Q. Any of the other plaintiffs' lawyers? Darren
22 Blum?
23 **A. No.**
24 Q. Before we get into your report, which I'll do
25 shortly, if we can get some terminology straight.

SPERLING & BARRACO, INC.

### Page 7

1      I'm assuming I don't have to go over the rules of
2  taking depositions with you, correct?
3  **A. No, sir.**
4  Q. One of the terms that is used is "FINRA," which
5  you've already used.
6      Is it okay with you that if we speak of FINRA in
7  this deposition that we also include the predecessor
8  organization, NASD?
9  **A. Yes. I was there for both of them.**
10 Q. You can make whatever distinction you want if it
11 becomes relevant for one organization or the other.
12 **A. They're the same.**
13 Q. Unless we specify otherwise, "FINRA" will mean
14 both of those things.
15 **A. Yes, sir.**
16 Q. And "clearing firm"?
17 **A. Yes, sir.**
18 Q. Just so we're on the same page with regard to
19 that, when we use the term "clearing firm," what is your
20 understanding of what that means?
21 **A. A clearing firm is an introducing firm that
22 enters into a contractual relationship with -- the
23 clearing firm clears their trades. In other words, the
24 introducing firm submits the trades to the clearing firm
25 for execution.**

SPERLING & BARRACO, INC.

### Page 8

1      **The clearing firm will generate confirmations,
2  account statements, margin calls, anything related to the
3  account.**
4  Q. All right. And the introducing firm is the firm
5  that is actually performing the sales function?
6  **A. Yes.**
7  Q. And the clearing firm generally is providing the
8  execution and back office --
9  **A. It's entirely a back office function, yes.**
10 Q. Okay. Got it.
11     When we're talking about "handling fees," what is
12 your understanding about what that means?
13 **A. In the context of an introducing relationship, a
14 clearing firm relationship, the handling fees in my view
15 are the handling fees that are charged by the clearing
16 firm to the introducing firm.**
17 Q. For what?
18 **A. For doing the paperwork to generate the trade
19 confirmation.**
20 Q. It's a separate transaction-related charge?
21 **A. Yes, it is.**
22     Separate from commissions; is that what you mean?
23 Q. Separate from commissions, yes, or maybe some
24 other fees.
25 **A. And maybe some other fees, yes.**

SPERLING & BARRACO, INC.

### Page 9

1  Q. In this case Newbridge would be an introducing
2  firm?
3  **A. Yes.**
4  Q. Or an introducing broker?
5  **A. Yes.**
6  Q. And we've identified some of the clearing firms
7  that were involved in this, one of which was Legent?
8  **A. Yes.**
9  Q. Which was acquired by COR Clearing as well?
10 **A. Yes.**
11 Q. And there was a predecessor called NFS?
12 **A. Yes.**
13 Q. And those are generally the clearing firms that
14 are related to the matters that have come up in this
15 lawsuit, correct?
16 **A. That's my understanding, yes.**
17 Q. And you've reviewed the clearing agreement
18 between Newbridge Securities and Legent, correct?
19 **A. Yes.**
20 Q. And along with that, there are also some other
21 documents relating to when a customer of Newbridge opens
22 an account with them, correct?
23 **A. Yes.**
24 Q. And some of those forms are provided by the
25 clearing brokers?

SPERLING & BARRACO, INC.

Page 10

1  A. Yes. I believe all the forms were provided by
2  the clearing brokers.
3  Q. And so if the account was with Legent, that would
4  be a Legent-provided form?
5      MR. SHAPIRO: Object to the form.
6      THE WITNESS: Yes.
7      BY MR. NOWAK: (Resuming)
8  Q. Just so the record is clear, what is your under-
9  standing about which form would be used by an introducing
10 broker when an account is opened by a customer?
11 A. Well, generally they would use the new account
12 form generally provided to them by the clearing firm.
13 Q. So in this case have you seen any of the accounts
14 for the named plaintiffs?
15 A. The new account forms?
16 Q. Correct.
17 A. I believe I have, yes.
18 Q. And were those new account forms provided by the
19 clearing broker, whichever one it was that was --
20 A. That's my understanding, yes, sir.
21 Q. So for example, for Ms. Finkel, her new account
22 forms were Legent forms?
23 A. I don't recall. But that sounds right, yes.
24 Q. And the reason why I'm asking is because we're
25 looking at a paragraph in one of those forms.

SPERLING & BARRACO, INC.

Page 11

1  A. I understand that, yes.
2  Q. It has some specific language that's relevant to
3  this case, correct?
4  A. Yes. And I've reviewed that language.
5  Q. Okay. The clearing firms are the ones that
6  charge handling fees, correct?
7  A. Yes.
8  Q. And the handling fees that were charged by Legent
9  in this case, do you know what they were?
10 A. My understanding -- I don't know specifically if
11 it's Legent or if it was all three. But it was $8 I
12 believe to $10.50.
13 Q. Okay. So there was a range?
14 A. It was a range, yes.
15 Q. The range was between $8 and $10.50?
16 A. I believe so.
17 Q. In your experience, is that a typical handling
18 fee to be charged by clearing brokers?
19 A. Yes.
20 Q. Do some of them charge less?
21 A. Yes.
22 Q. Do some of them charge more?
23 A. Probably, yes.
24 Q. In your experience, what would be the range of
25 fees that a clearing broker would charge during the

SPERLING & BARRACO, INC.

Page 12

1  period of time that we're discussing here?
2  A. Anywhere from $4 to maybe $12.
3  Q. Okay. So is it fair to say that there's no
4  standard handling fee that's charged by clearing brokers?
5      MR. SHAPIRO: Object to the form.
6      THE WITNESS: Answer?
7      MR. SHAPIRO: I'm just going to -- I may
8  throughout the deposition object to the form of the
9  question. It's just to preserve the record.
10     You can go ahead and answer if you understand the
11 question.
12     BY MR. NOWAK: (Resuming)
13 Q. Is it fair to say that the handling fees that are
14 charged by clearing brokers are not uniform?
15 A. No. They depend on the cost.
16 Q. And how would they calculate that handling fee?
17 A. An introducing firm?
18 Q. No, the clearing broker.
19 A. The clearing broker would calculate it -- I don't
20 know specifically how. But they're required to calculate
21 it in such a manner that they can demonstrate that the
22 charge is related to the actual costs.
23 Q. So is it your position that clearing brokers are
24 not allowed to charge as a handling fee anything other
25 than their actual costs?

SPERLING & BARRACO, INC.

Page 13

1  A. Yes.
2  Q. Do you know if any clearing brokers do charge a
3  handling fee in excess of their actual costs?
4  A. I do not know.
5  Q. If a clearing firm is a member of FINRA, are they
6  bound by the same FINRA rules?
7  A. Yes.
8  Q. The same FINRA rules as any FINRA member?
9  A. Yes, except those -- they don't do -- to the
10 extent that they do not do sales activity, of course they
11 wouldn't be subject to the sales-related.
12 Q. Right.
13    But for example, FINRA Rule 2430, which relates
14 to fees, that would apply to clearing brokers as well?
15 A. I believe so.
16 Q. And do clearing firms charge commissions?
17 A. On a transaction?
18 Q. Yes.
19 A. No.
20 Q. So they wouldn't be -- FINRA Rule 2440 wouldn't
21 apply to them, for example?
22 A. No, because they don't charge commissions. The
23 commissions are charged by the introducing broker.
24 Q. Right.
25    Let's go through your report. And in your report

SPERLING & BARRACO, INC.

### Page 14

1  you use certain terminology which I'd also like to get
2  straight before we begin. One of those is "direct and
3  actual costs."
4       What do you mean by that?
5  A. What I mean by that is the cost -- the charge
6  that Newbridge's clearing firm charged to Newbridge for
7  handling.
8  Q. And in your report on page 5, Footnote No. 2, you
9  make reference to some other Newbridge disciplinary
10 action.
11 A. Yes, sir.
12 Q. Do any of those have anything to do with handling
13 fees?
14 A. To handling fees specifically, no.
15 Q. So do you consider them to be relevant to this
16 handling fee claim?
17 A. I consider them to be relevant as a pattern of
18 conduct by Newbridge in improperly charging its customers
19 in various ways. Granted, the cases I cite do not
20 involve handling fees. But in my view there were other
21 ways that -- there are other violations in which
22 Newbridge charged their customers.
23      In one case it was they weren't getting fair
24 market price for the customers. There were cases where
25 the customers were being disadvantaged as a result of

### Page 15

1  charges by Newbridge. They were overcharged in some way.
2  Q. They were all fee-related?
3  A. No. One was a transaction execution. They
4  executed buy-and-sell orders of prices that were not as
5  favorable to the customers under prevailing market
6  conditions. They sold corporate bonds to customers at
7  unfair prices.
8       In one case they charged excessive markups and
9  markdowns. And in one case they failed to establish best
10 execution.
11      So my point was simply that these other cases
12 demonstrate a pattern of conduct.
13 Q. Of?
14 A. Of Newbridge. How can I put it?
15      Newbridge failed in its responsibilities to its
16 customers. And as a result, customers were disadvantaged
17 financially.
18 Q. Is this to make the point that they're just
19 serial rule violators?
20 A. It's to make a point that they have in the past
21 on many occasions committed rule violations in which
22 customers didn't get best execution or they charged them
23 excessive markups and markdowns. It's where the
24 customers suffered a loss either in -- in the execution
25 of the transaction.

### Page 16

1  Q. You're an attorney, correct?
2  A. I'm sorry if I'm not being clear.
3  Q. You're an attorney?
4  A. Former. I'm not licensed now.
5  Q. But you did practice as an attorney?
6  A. Absolutely, yes.
7  Q. And you acted as an attorney on behalf of NASD
8  and FINRA --
9  A. Yes.
10 Q. -- in bringing enforcement cases?
11 A. Yes, sir.
12 Q. And so you're familiar with the evidence rules?
13 A. Yes.
14 Q. What I'm trying to understand is how these prior
15 disciplinary actions relate to this case in terms of
16 whether they tend to prove or disprove something that's
17 at issue in this case.
18      MR. SHAPIRO: Object to the form.
19      THE WITNESS: They do not -- they do not relate
20 specifically to the violations in this case.
21      They were in there -- I put them in there merely
22 to show a pattern.
23      MR. NOWAK: Okay.
24      THE WITNESS: I think the best way to put it is
25 where they showed a disregard for the customer's best

### Page 17

1  interest.
2       BY MR. NOWAK: (Resuming)
3  Q. On page 4 of your report -- and it's the second
4  full paragraph, just above the middle of the page
5  starting "Newbridge violated the standard of care."
6       Do you see that paragraph?
7  A. Yes, sir.
8  Q. In the middle of that paragraph it says "In
9  addition, the nature of the charge was mischaracterized
10 on customer trade confirmations as a handling fee."
11      Do you see that statement?
12 A. Yes, sir.
13 Q. Is it your understanding that this case involves
14 mischaracterizations, misrepresentations, or omissions?
15      MR. SHAPIRO: Object to the form.
16      THE WITNESS: No. That was the result of the way
17 they charged the fee.
18      BY MR. NOWAK: (Resuming)
19 Q. I guess my question is: Is it your understanding
20 that the issue in this case relates solely to the amount
21 of the handling fee that was charged and not how it was
22 characterized?
23 A. The amount and -- yeah, the amount. And also the
24 alleged discriminatory nature of the fees among the
25 offices, yes.

Page 18

1  Q. But not the way it was described?
2  A. That's a result of the way they charged it.
3  Q. Okay. So --
4  A. And FINRA charged them with 10b-10, which is a
5  fraud rule. That's the one that says that you have to
6  disclose all your transaction-related remuneration.
7  Q. Right.
8  A. 10b-10 is not charged in this case.
9  Q. Nor is any fraud or misrepresentation?
10 A. No, sir.
11 Q. Or omission to state a material fact?
12 A. No, no filed charges.
13 Q. So we're just talking about the amount of the
14 handling filing fee here?
15    MR. SHAPIRO: Object to the form.
16    THE WITNESS: Yes.
17    BY MR. NOWAK: (Resuming)
18 Q. What's your understanding about the issue
19 concerning the handling fee?
20    MR. SHAPIRO: Object to the form.
21    THE WITNESS: Well, I guess as it's charged in
22 the complaint, the handling fee is alleged to have been a
23 contractual violation because of the language that we
24 talked about briefly before.
25    Newbridge is also charged with violating a

SPERLING & BARRACO, INC.

Page 19

1  common-law duty of fairness. And in that respect, you
2  know, it's almost the same factual basis, except the
3  contractual obligation doesn't involve the discrimina-
4  tion, I don't believe.
5    MR. NOWAK: Right.
6    THE WITNESS: But the common-law duty of fair
7  dealing deals with both of those issues.
8    BY MR. NOWAK: (Resuming)
9  Q. So one issue would be the amount of the handling
10 fee?
11 A. Yes.
12 Q. Which is alleged to have been excessive?
13 A. Yes, sir.
14 Q. And the other issue is that it's unfairly
15 discriminated between customers?
16 A. Yes, sir.
17 Q. By the amount that was charged?
18 A. Yes. There were different amounts charged,
19 depending upon which office you were dealing with.
20 Q. I'm not trying to trick you. I'm just trying to
21 get straight what the issues are that we're talking
22 about.
23 A. Absolutely. Yes, I understand.
24 Q. And in the middle of page 4 of your expert
25 witness report and then down from there you quote from

SPERLING & BARRACO, INC.

Page 20

1  the FINRA AWC involving Newbridge, correct?
2  A. Yes, sir.
3  Q. And in those two paragraphs that you quote is
4  there anything contained within it that you understand to
5  be related to the excessive amount of the handling fee?
6  A. On the first sentence, "Although reflected on
7  customer trade confirmations as a charge for 'handling,'
8  the charge was not reasonably related to any direct
9  handling-related services performed by the firm, or
10 handling-related expenses incurred by the firm in
11 processing the transaction, but rather effectively was an
12 additional commission."
13    Then it says "The particular dollar amount
14 charged was not attributable to any" --
15 Q. Well, you just skipped a sentence there, the
16 conclusion from that.
17 A. "The characterization of the charges being for
18 handling was therefore inaccurate and improper."
19 Q. So the conclusion there was that the handling
20 fees were therefore inaccurate and improper, not
21 excessive, correct?
22    MR. SHAPIRO: Object to the form.
23    THE WITNESS: To me, "improper" means excessive.
24 It doesn't mean they were too small. It means they were
25 excessive.

SPERLING & BARRACO, INC.

Page 21

1    BY MR. NOWAK: (Resuming)
2  Q. Is there anywhere in the AWC which FINRA and
3  Newbridge entered into that you excerpt from in your
4  expert witness report -- is there any sanction that's
5  brought by FINRA as a result of the fee being excessive
6  as opposed to misdescribed?
7  A. Yes.
8  Q. And what is the sanction that's brought against
9  Newbridge as a result of the fee being excessive?
10 A. Well, first of all, they found -- FINRA found
11 that Newbridge violated 2430. That's the one that says
12 fees have to be reasonable and not discriminatory. So
13 they could have found that the fees were not reasonable.
14    The reason they found they weren't reasonable is
15 in these paragraphs. It wasn't directly related to their
16 actual charges or costs.
17 Q. Where in the AWC does FINRA say that the fee that
18 was charged by Newbridge as a handling fee was
19 unreasonable?
20 A. I just read it. It says "Although reflected on
21 customer trade confirmations as a charge for 'handling,'
22 the charge was not reasonably related to any direct
23 handling services."
24 Q. It doesn't say that therefore it was unreason-
25 able? It just says it wasn't reasonably related,

SPERLING & BARRACO, INC.

Page 22

1  correct?
2      MR. SHAPIRO: Object to the form.
3      THE WITNESS: It says it wasn't reasonably
4  related. And I think that means unreasonable.
5      BY MR. NOWAK: (Resuming)
6   Q. Does FINRA in its AWC with Newbridge Securities
7  specify by how much the handling fee was excessive?
8   A. It doesn't say specifically. But it does say --
9  they do say it has to be related to their actual costs.
10  Q. Where does it say that?
11  A. Again, it's the thing I read. "The charge was
12 not reasonably related to any direct handling services
13 performed by the firm."
14      Also, if you look at -- can I refer to the AWC?
15  Q. Sure.
16  A. If you look at the AWC on page 4, the language in
17 the third full paragraph -- again, they say in the middle
18 that "The fee was not directly related to any specific
19 handling services performed by the firm or handling-
20 related expenses incurred by the firm in processing this
21 transaction. Newbridge's" -- I'm sorry. I'm reading the
22 wrong thing.
23  Q. You're on page 4 of 8?
24  A. I'm on 4 of 8. I'm sorry. I was reading the
25 wrong paragraph. It's on page 5. My apologies.

Page 23

1      It's the second bullet point. And this is part
2  of the sanctions that FINRA imposed.
3      It says "With respect to any transaction-based
4  charge or fee that may be imposed for a service performed
5  or a cost incurred by the firm (such as a postage charge
6  or a charge imposed by a clearing firm) that is not
7  included as part of the reported commission or markup/
8  markdown, the firm shall fully and accurately on trade
9  confirmations and" --
10  Q. "Disclose."
11  A. I'm sorry.
12      "Fully and accurately disclose on trade
13 confirmations and in every written communication with
14 customers or the public in which transaction fees,
15 commissions, or markup/markdown charges are discussed
16 (including fee schedules, if any, or new account
17 documentation containing such information), the specific
18 services or costs for which the fee or charge relates
19 and, if relating to more than one service or cost, the
20 precise portion of the charge or fee attributable to
21 each. And the firm must retain detailed records to
22 substantiate the services performed or costs incurred and
23 to demonstrate how the dollar amount of the charge or fee
24 was calculated or determined. And the firm shall" --
25 well, the next one is not relevant.

Page 24

1   Q. That subparagraph 2 that you read in that bullet
2  point says that "The firm shall fully and accurately
3  disclose."
4   A. Right, it does.
5   Q. Where does it say in there that the fee was
6  excessive?
7      MR. SHAPIRO: Object to the form.
8      THE WITNESS: It says it was excessive because
9  they found a violation of 2430.
10      BY MR. NOWAK: (Resuming)
11  Q. It doesn't say in that language that you just
12 read anywhere that the fee is excessive?
13     MR. SHAPIRO: Object to the form.
14     THE WITNESS: You know, in that particular
15 paragraph -- in other places in the AWC it doesn't say
16 that. In that paragraph it doesn't say it specifically.
17     But to me, it's clear that by requiring to retain
18 detailed records to "document the actual cost incurred
19 and demonstrate how the dollar amount of the charge or
20 fee was calculated or determined" -- it's clear from
21 there that they found these fees excessive.
22     BY MR. NOWAK: (Resuming)
23  Q. Show me anywhere in the AWC that you hold in your
24 hand where FINRA says that the handling fee that's
25 charged by Newbridge is excessive.

Page 25

1      MR. SHAPIRO: Object to the form.
2      THE WITNESS: They found a violation of 2430,
3  which requires fees to be reasonable.
4      BY MR. NOWAK: (Resuming)
5   Q. So you're inferring from that that they thought
6  that they were excessive?
7      MR. SHAPIRO: Object to the form.
8      THE WITNESS: From that and this other language
9  in here.
10     BY MR. NOWAK: (Resuming)
11  Q. Show me. We have all day.
12     MR. SHAPIRO: Object to the form.
13     THE WITNESS: On page 4. "The particular dollar
14 amount charged was not attributable to any specific cost
15 or expense incurred by the firm in executing the trade or
16 determined by any formula applicable to all customers.
17 Rather, it was determined by the individual rep."
18     We read that before. And that clearly indicates
19 to me that these were excessive. And I'm not inferring
20 from 2430. They charged 2430.
21     BY MR. NOWAK: (Resuming)
22  Q. You're inferring from that language that the
23 conclusion of FINRA may have been excessive.
24     They don't actually say that it was excessive, do
25 they?

Page 26

1  MR. SHAPIRO: Object to the form.
2  THE WITNESS: I believe they do say it.
3  BY MR. NOWAK: (Resuming)
4  Q. Show we where the word "excessive" is in this
5  document.
6  MR. SHAPIRO: Object to the form.
7  THE WITNESS: I'm not sure the word "excessive"
8  is in there. But to me, it's quite clear that they found
9  that the charges were excessive.
10  BY MR. NOWAK: (Resuming)
11  Q. If the word "excessive" is not in the AWC, then
12  it's your interpretation of the language in here that
13  it's excessive, correct?
14  MR. SHAPIRO: Object to the form.
15  THE WITNESS: Yeah. I think it's the only
16  interpretation one can come to.
17  BY MR. NOWAK: (Resuming)
18  Q. As opposed to a disclosure issue?
19  MR. SHAPIRO: Object to the form.
20  THE WITNESS: They were both the fees involved
21  and 10b-10 involved as a disclosure charge. It was
22  failure to disclose -- there was inaccurate disclosure.
23  The 2430 charge has nothing to do with
24  disclosure. The 2430 charge has to do with fairness of
25  fees and charges.

SPERLING & BARRACO, INC.

Page 27

1  So they charged that they violated -- they
2  violated 2430 by charging unreasonable, excessive fees
3  that were not related to their actual costs.
4  BY MR. NOWAK: (Resuming)
5  Q. By how much were they excessive?
6  A. The difference between the actual costs and the
7  amount they charged.
8  Q. And is that what FINRA found in the AWC?
9  A. I don't believe they found that specifically.
10  That's my opinion.
11  Q. That's your inference from all of the evidence
12  that you've seen?
13  A. Yes.
14  Q. But it's not in the AWC?
15  A. Specifically what's not in the AWC?
16  Q. That FINRA found that the fee -- that Newbridge
17  charges a handling fee that was excessive because it was
18  over and above the direct and actual costs charged by the
19  clearing broker.
20  MR. SHAPIRO: Object to the form.
21  THE WITNESS: I think that's what it says.
22  BY MR. NOWAK: (Resuming)
23  Q. You have to show me where it says that.
24  A. I think I just did.
25  Q. Okay. There's nothing else other than what

SPERLING & BARRACO, INC.

Page 28

1  you've testified to in the AWC that says that the
2  Newbridge handling fee is excessive because it's over and
3  above the direct and actual costs charged to them by the
4  clearing firm?
5  MR. SHAPIRO: Object to the form.
6  THE WITNESS: Could I look please?
7  BY MR. NOWAK: (Resuming)
8  Q. Sure. Take as much time as you want.
9  A. Well, again, in the following paragraph they find
10  that the commission was not directly related to any
11  specific expense.
12  No, I don't see anything else.
13  MR. NOWAK: If you have no objection, I'm going
14  to mark the second amended complaint and the exhibits as
15  a depo exhibit, because it has a lot of this stuff that's
16  attached that we're referring to.
17  MR. SHAPIRO: Okay.
18  MR. NOWAK: We'll make this Exhibit 3.
19           (The following document
20           referred to was marked as
21           Deposition Exhibit No. 3
22           for identification.)
23  THE WITNESS: Can I clarify a point?
24  MR. NOWAK: Sure.
25  THE WITNESS: You were asking -- you were asking

SPERLING & BARRACO, INC.

Page 29

1  if there's any other language in the AWC I could point
2  to. And I can't other than what I've already pointed to.
3  But I would also point out that there were FINRA
4  releases. There was a release that announced that they
5  had taken action against I think five or six brokers.
6  BY MR. NOWAK: (Resuming)
7  Q. We'll get to that.
8  I just wanted you to identify in the second
9  amended complaint, a copy of which I've marked as Exhibit
10  No. 3, that Exhibit F is the AWC that we've been talking
11  about.
12  A. Yes, sir.
13  Q. Okay. You made mention of a FINRA release.
14  A. Yes, sir.
15  Q. Correct me if I'm wrong. But they do this
16  sometimes in relation to specific rules, correct?
17  A. Yes. And I'm talking about a specific release,
18  yes, on handling charges.
19  Q. So for Rule 2430, which is one that we've been
20  discussing, FINRA has a formal interpretive memorandum
21  that sometimes they release with regard to rules which
22  they call informational memoranda, correct?
23  A. Yes.
24  Q. They abbreviate it IMs?
25  A. Yes.

SPERLING & BARRACO, INC.

Sperling & Barraco, Inc.
www.sperlingandbarraco.com

(7) Pages 26 - 29

Page 30

1  Q. And it's in relation to a specific rule?
2  A. Yes, sir.
3  Q. Do you know if there were any informational
4  memoranda that were released with regard to Rule 2430?
5  A. I don't know.
6  Q. Any other official FINRA interpretation of Rule
7  2430 that says that an introducing firm is not permitted
8  to charge a handling fee over the amount of a handling
9  fee that is charged to it by its clearing firm?
10 A. You're talking other than the release involving
11 the disciplinary actions against five firms? Other than
12 that?
13 Q. Yes, other than that.
14 A. Not that I'm aware of.
15 Q. Okay. So let's get to that then. And by that, I
16 mean Exhibit E, which is right in front of that.
17 A. The news release, right?
18 Q. That's the release you're talking about?
19 A. Yes, sir.
20 Q. And this is a FINRA press release concerning its
21 sanctioning of five introducing brokers; not Newbridge,
22 but other introducing brokers with regard to improper
23 handling fees, correct?
24 A. Yes, yes.
25 Q. And were these the subject of AWCs themselves?

SPERLING & BARRACO, INC.

Page 31

1  A. Yeah, there were AWCs, I believe.
2  Q. Have you reviewed those AWCs?
3  A. I took a look at a couple of them, I think. I
4  don't recall which ones.
5  Q. So from this press release, which is Exhibit E to
6  Exhibit No. 3 for your deposition, can you show me where
7  FINRA is making the point about the excessive nature of
8  the handling fees that these brokers charged.
9      MR. SHAPIRO: Object to the form.
10     THE WITNESS: The third paragraph. "The cases
11 resulted from a targeted review of improper fees charged
12 by broker/dealers in which FINRA found that the firms
13 were routinely charging customers for handling fees that
14 far exceeded the actual cost of the direct handling-
15 related services the firm incurred in processing
16 securities transactions. In some cases the firms charged
17 a handling fee of almost $100 per transaction and earned
18 a substantial percentage of the revenue from these fees."
19     BY MR. NOWAK: (Resuming)
20 Q. Okay. Is that it?
21 A. Yes, sir.
22 Q. And the sanctions that were imposed as a result
23 of that?
24 A. Okay. You're referring to the sanctions?
25 Q. Right.

SPERLING & BARRACO, INC.

Page 32

1  A. Are you talking about the last paragraph?
2  Q. Yes.
3  A. The corrective action, yeah.
4  Q. In that paragraph the sanction is that the firms
5  have "to fully and accurately disclose the specific
6  service performed and the related fee on confirmations,"
7  correct?
8  A. Yes, sir.
9  Q. Is there anywhere in there where it says these
10 brokers are not allowed to charge these fees anymore?
11 A. Charge handling fees?
12 Q. Yes.
13 A. No. They can charge handling fees as long as
14 they comply with the rule.
15 Q. So the fact that these brokers were charging
16 handling fees was not the issue? It was the way that
17 they were disclosing them?
18     MR. SHAPIRO: Object to the form.
19     THE WITNESS: It was the way they were disclosing
20 it and it was also excessive handling fees.
21     BY MR. NOWAK: (Resuming)
22 Q. By what amount?
23 A. By the amount from their cost to what they
24 charged -- the difference between the cost and what they
25 charged.

SPERLING & BARRACO, INC.

Page 33

1  Q. Was any part of the sanctions that was imposed by
2  FINRA that they were not allowed to charge handling fees
3  in excess of their direct and actual costs?
4      MR. SHAPIRO: Object to the form.
5      THE WITNESS: No. I mean, brokers are expected
6  to comply with the rules. They don't have to be told.
7      BY MR. NOWAK: (Resuming)
8  Q. Except when FINRA brings an enforcement action?
9  A. Well, they should know the rules.
10 Q. My question is: Is there anything in this
11 document, Exhibit E to Deposition Exhibit No. 3, that
12 specifies the amount by which FINRA says these fees were
13 excessive?
14 A. I believe in the third paragraph they say it's
15 the actual costs.
16 Q. Okay. Were any of these brokers required to
17 return any of those fees to customers?
18 A. Not from reading this, I don't believe so.
19 Q. Is part of the corrective action that they were
20 not allowed to charge handling fees in excess of their
21 direct and actual costs?
22     MR. SHAPIRO: Object to the form.
23     THE WITNESS: It doesn't say that specifically,
24 no. But that is implicit, because you're supposed to
25 comply with the rules.

SPERLING & BARRACO, INC.

Page 34

They did say that they were excessive.
BY MR. NOWAK: (Resuming)
Q. They said they were required to disclose in the future what the fees were?
A. Right. And it says here that one of the -- part of the violation was that their handling fees far exceeded the actual cost of the direct handling-related services that they incurred.
In here and in the specific AWCs they repeatedly talk about the charges not being related to their actual costs.
And as I said, in the corrective action for Newbridge they're required to maintain detailed records which demonstrate what their costs are and on what basis they're making a charge.
Q. Is there any FINRA publication that you know of that says that under Rule 2430 you are not allowed to charge a handling fee in excess of your direct and actual costs?
MR. SHAPIRO: Object to the form.
THE WITNESS: I believe by their constant referral to these charges -- not only Newbridge, but the other firms -- these charges being in excess of their cost -- they constantly talk about the cost as being the determinative factor.

Page 35

If you're asking me do they say anywhere in here, "Hey, don't charge anything in excess of your clearing firm charge" --
MR. NOWAK: That's my question.
THE WITNESS: It does not say that specifically.
BY MR. NOWAK: (Resuming)
Q. And it doesn't say that anywhere in any FINRA publication?
MR. SHAPIRO: Object to the form.
THE WITNESS: Not that specific language. But I do believe that FINRA has determined, and as demonstrated in these documents, that that is your benchmark.
BY MR. NOWAK: (Resuming)
Q. What you're taking away from the AWC with Newbridge and this press release is that message? That's what you're saying?
A. Absolutely, yes.
Q. But it doesn't actually say that anywhere?
MR. SHAPIRO: Object to the form.
THE WITNESS: I think it does.
BY MR. NOWAK: (Resuming)
Q. Based upon what you've read from these documents?
A. Yes.
Q. But no specific release from FINRA?
MR. SHAPIRO: Object to the form.

Page 36

THE WITNESS: No, sir.
BY MR. NOWAK: (Resuming)
Q. So is it your opinion that if an introducing broker charges any amount of handling fee above its actual and direct costs that it is in violation of Rule 2430?
A. Yes.
Q. Not a penny more?
A. If they could justify some other handling cost on top of the clearing charge -- if they could demonstrate that there was some other cost and could show the specific amount of that cost and what it was based on, yeah. It still is their cost. But it's not necessarily just the clearing charge.
They may have additional expenses. I don't know.
In this case that's really not an issue. I believe it's not disputed.
I believe Mr. Spitler in his testimony indicated that when he negotiated these fees with the various offices and various reps there was nothing they based it on. It wasn't based on any cost whatsoever and was clearly intended to be a compensation.
So I don't think that's an issue.
Q. My question though is: Is it your opinion that in the industry that an introducing firm is or is not

Page 37

allowed to charge another amount as a handling fee in excess of their direct and actual costs?
MR. SHAPIRO: Object as to the form. Asked and answered.
THE WITNESS: Yes.
BY MR. NOWAK: (Resuming)
Q. They are?
A. It has to be their direct and actual costs, yes.
Q. It has to be the introducing firm's direct and actual costs?
A. Yeah.
Q. Which would be in addition to and on top of the clearing broker's direct and actual costs?
A. If they could demonstrate an actual cost that they incurred in executing a transaction that's over and above what the clearing firm charges them, yes, they can do that as long as it's documented.
Q. Is there an amount that they're allowed to charge?
A. Whatever their cost is. It's not a specific amount, no.
Q. It would be based upon what their actual costs are?
A. Yes, sir.
Q. And your opinion therefore would be, if I

Page 38

understand you correctly -- let me ask a better question. That started off stupid.

So whether or not the handling fee that an introducing broker was allowed to charge over and above the charges imposed by the clearing firm -- whether or not that was reasonable or whether that was permissible under the rule, would depend upon that specific transaction?

MR. SHAPIRO: Object to the form.
THE WITNESS: That specific transaction?
BY MR. NOWAK: (Resuming)
Q. Is it a transaction-by-transaction fee that you're talking about as being reasonable if it's imposed -- reasonable related to the transaction? Or is it reasonable related to the clearing firm or the introducing firm --
A. Reasonable related to the cost.
Q. The cost of the introducing firm in handling that transaction or generally?
MR. SHAPIRO: Object to the form.
THE WITNESS: It could be either.
BY MR. NOWAK: (Resuming)
Q. Okay. So if the introducing firm could justify a handling fee in excess of the actual and direct costs charged them by the clearing firm either with regard to

SPERLING & BARRACO, INC.

Page 39

that specific transaction or as a general matter, they would be allowed to charge that handling fee?
MR. SHAPIRO: Object to the form.
THE WITNESS: On these transactions -- I'm sorry. The charges are not determined by Newbridge on a transaction.
BY MR. NOWAK: (Resuming)
Q. I'm talking about in the industry, not Newbridge in particular.
A. Okay. Repeat it then.
Q. In the securities industry the amount that the introducing broker would be allowed to charge as a handling fee over and above the clearing broker handling fee, would that be okay if it were reasonably related to the transaction?
A. If there were some -- I can't think of an instance. If there were some reason that a transaction was more difficult than another one or required more back office work or something like that, yes.
The point is though that they have to be related to their actual costs.
And I think FINRA has made it quite clear that these kinds of charges are not profit centers. These are fees. They are costs. And profits are disclosed in a different way.

SPERLING & BARRACO, INC.

Page 40

Q. So the answer is, yes, it could be charged if it was reasonably related to the transaction?
MR. SHAPIRO: Object to the form.
THE WITNESS: Yeah, if they could demonstrate.
BY MR. NOWAK: (Resuming)
Q. The second part of the question is: The amount of the handling fee that the introducing firm could charge over and above the amount that the clearing broker charges with them would be okay if they could reasonably relate it to their general expenses as well?
MR. SHAPIRO: Object to the form.
THE WITNESS: I'm not sure about that. I'm not sure.

They have to demonstrate it somehow. I don't know whether -- from my experience at FINRA, I don't believe it would be like an overhead kind of thing. I don't think they could do that.

That's just my opinion. I'm really not sure. That's how I would interpret it.
BY MR. NOWAK: (Resuming)
Q. Okay. But that's not something you ever dealt with in your career at FINRA?
A. Handling charges directly?
No.
Q. I believe in your report you say that you were

SPERLING & BARRACO, INC.

Page 41

involved in some 400 enforcement actions, correct?
A. Yes, sir.
Q. Did any of those involve handling fees?
A. Not directly.
Q. In your 35-year career with FINRA and NASD did you have occasion to --
A. I was only with FINRA for 18 years. I was other places before that.
Q. Okay. 18 years. Right, 35 years in the industry and 18 years with FINRA.
A. Yes, sir.
Q. So in your 18-year career with FINRA did you ever come across an introducing broker that charged a handling fee?
A. That charged a handling fee?
Sure.
Q. Did you ever bring an enforcement action against them as a result of that?
A. No.
Q. Why not?
MR. SHAPIRO: Object to the form.
THE WITNESS: It didn't come up.
If I may, it may help you if I explain the process at FINRA for bringing actions. Would that help you?

SPERLING & BARRACO, INC.

Page 42

MR. NOWAK: Sure.

THE WITNESS: I was in the Atlanta office, which was the southeast region. Within that office were two departments: the department of member regulation and enforcement. They're separate.

The department of member regulation does the exams of firms; both routine exams they do once a year and they do investigations of customer complaints, of disclosures on termination notices, those sorts of things. They do the investigation.

Sometimes enforcement would get involved early on if it was a really complicated case. If it wasn't, they'd just do their investigation and then turn it in to enforcement, to me. And I determine whether formal charges should be brought or not. I review the files and the investigation and the base of the evidence and everything else.

And a case directly involving excessive handling fees, I never had it. I never had it.

MR. NOWAK: Okay.

THE WITNESS: I had a bunch of markup/markdown cases.

BY MR. NOWAK: (Resuming)
Q. Related to commissions?
A. It relates to commissions.

SPERLING & BARRACO, INC.

Page 43

And I notice in Mr. Paulukaitis's report he talked about -- he talked about sometimes in markup cases what the examiners would do was take the handling fee and they fold it into the markup or commission disclosure and do a determination as to whether they violated the 5% rule.
Q. Right.
A. I had a lot of markup cases.

I don't specifically recall. And I have no reason to disbelieve what David says. And it could very well have been that some of those markup cases were analyzed in that way, that the handling charges were added into the commission or the markup.

But directly related to excessive markups, no.
Q. So just to take apart a little bit what you just said, FINRA Rule 2440 relates to commissions, correct?
A. Yes, sir.
Q. And there are interpretive memoranda that have been issued by FINRA in relation to that rule?
A. Yes.
Q. And in the industry those interpretive memoranda have promulgated something which is referred to generally as the 5% rule?
A. Yes.
Q. And the 5% rule, as I understand it -- correct me

SPERLING & BARRACO, INC.

Page 44

if I'm wrong -- is that commissions or markups in securities transactions are not permitted generally to exceed 5% of the transaction amount?
A. Yes. That is the guideline.
Q. I'm sorry?
A. It is a guideline.
Q. It's a guideline? So it's not a bright line, but it's a guideline?
A. Yes.
Q. Is it your experience that if a handling fee is charged which is high that one of the ways that FINRA evaluates that handling fee is to combine it with the commission that was charged for that same transaction to see whether the combination of those two charges exceeded the 5% fee -- or 5% guideline?

MR. SHAPIRO: Object to the form.
THE WITNESS: That's my understanding, yes.
BY MR. NOWAK: (Resuming)
Q. Did you ever do that?
A. I didn't do the investigations.

The information was presented to me fully developed -- supposedly fully developed. If I wanted more information, I could ask for it.
Q. So are you saying that the people at FINRA who did the examination would be the ones who would determine

SPERLING & BARRACO, INC.

Page 45

how to resolve the handling fee issue?
A. Well, they would be the ones who would identify the issue, yes.
Q. And determine whether or not they wanted to refer it for enforcement?
A. Yeah, determine whether they were going to make a recommendation for enforcement action. Yes.
Q. Okay. One of the other things that is discussed in the second amended complaint and which you discuss in your report is the term "industry standard."
A. Yeah.
Q. So my question to you is: What do you mean when you say "industry standard"? What do you understand that term to mean?
A. That issue was brought up in connection with the language in the customer agreement that says the customer agrees to pay fees -- a fee prevailing rate, period.

It doesn't say "prevailing rate in the securities industry."

I don't believe that you necessarily have to add that language in terms of the language contract construction.

It says -- it doesn't say "in the securities industry, but I agree to pay at the prevailing rate."
Q. Right.

SPERLING & BARRACO, INC.

Page 46

1  A. If you were to interpret it to mean in the
2  securities industry, it's kind of a strange interpreta-
3  tion. Because it's not really industry standard. It's a
4  rule requirement.
5      So you could say that the industry standard is
6  what's required by the rule. You don't have to say that
7  in this case in my view. If you end the sentence
8  after -- without the language "in the securities
9  industry," in my view there's only one thing it could
10 mean.
11     It means the customer agrees to pay fees at the
12 prevailing rate. And that means the prevailing rate that
13 the broker is charging them, which should be the amount
14 the clearing firm is charging them.
15     So in my view -- and I've reviewed a lot of
16 customer agreements in my day -- what that means is the
17 customer agrees to pay whatever Newbridge charges them,
18 as determined by what the clearing firm charges them.
19     And it says in there that the rates may change.
20 And in my view what that can only mean is the clearing
21 firm sometimes changes its rate.
22     That's how I would interpret it.
23 Q. Your interpretation of prevailing rate in the
24 Legent agreements that Newbridge used for its customers
25 is not prevailing rate in the securities industry?

SPERLING & BARRACO, INC.

Page 47

1  A. Well, I think you could say, yes, it is the
2  prevailing rate. The prevailing rate is their actual
3  cost if you were to insert that language "in the
4  securities industry."
5  Q. Okay.
6  A. But I don't think that's what the clearing firm
7  intended. The clearing firm writes the language.
8      I don't know to what extent Newbridge reviews --
9  you know, they're mostly boilerplate. I don't know to
10 what extent they actually reviewed it.
11     It's the clearing firm's language and it's from
12 the clearing firm's point of view.
13     To me, that's what it means. That's the obvious
14 explanation, the obvious definition to me.
15 Q. My original question was: What is it that you
16 mean when you say "industry standard" with regard to
17 fees?
18 A. Well, the industry standard with regard to
19 handling fees is that handling fees have to be kept to
20 reflect actual cost.
21 Q. And where does that industry standard come from?
22 A. In the rule.
23 Q. And the rule you're referring to is 2430?
24 A. Yeah, 2430.
25 Q. 2430 doesn't -- it says only that they have to be

SPERLING & BARRACO, INC.

Page 48

1  reasonable and not discriminatory?
2  A. Right.
3  Q. So --
4  A. And I believe that --
5  Q. Let's back up a second. Let me get a little bit
6  more fundamental. Forget about fees for the moment.
7      What is your understanding of the term "industry
8  standard"? What does that mean?
9  A. Well, it's hard without a specific reference. It
10 would be -- if it was in terms of charges or commissions
11 or something like that?
12 Q. Anything.
13     Do you have a general understanding of what a
14 general "industry standard" might mean?
15 A. I assume whatever the specific subject is, you
16 would have to go out and survey firms and see what
17 they're doing.
18     In this case it doesn't make a lot of sense.
19 Because in my view, again, that standard is dictated by
20 the rule.
21     So whether you go out and canvas firms or not,
22 clearly they're all going to have different charges,
23 depending on what the clearing firm charges.
24 Q. Right.
25     Are you aware of any survey that's been done of

SPERLING & BARRACO, INC.

Page 49

1  introducing firms with regard to handling fees?
2  A. No, I'm not.
3  Q. Do you know whether introducing firms like
4  Newbridge during that same period that we're talking
5  about here charged handling fees in excess of the direct
6  and actual costs that they were charged by their clearing
7  broker?
8  A. Well, at least those five firms that were cited
9  by FINRA.
10 Q. Any others that you know of?
11 A. Not that I know of, no.
12 Q. You don't know whether they do or whether they
13 don't?
14 A. Whether they do or don't what?
15 Q. Charge handling fees in excess of the direct and
16 actual costs that's charged to them by their clearing
17 broker.
18 A. Well, I know that's what FINRA found.
19 Q. The world of introducing brokers, the universe of
20 introducing brokers, not just the five that were
21 sanctioned by FINRA and not just Newbridge, but the other
22 introducing brokers in the world, do you know if any of
23 them charge handling fees in excess of the direct and
24 actual costs that they are charged by --
25 A. I don't know.

SPERLING & BARRACO, INC.

Page 50

1  Q. You don't know one way or the other?
2  A. No.
3  Q. So you don't know what most of them do with
4  regard to handling fees?
5  A. I have nothing to survey, no.
6  Q. So if an industry standard was what most of the
7  people do in the industry, you wouldn't know what the
8  industry standard was for handling fees based upon what
9  most people do?
10     MR. SHAPIRO: Object to the form.
11     THE WITNESS: No, I don't agree with that.
12     BY MR. NOWAK: (Resuming)
13  Q. You don't agree with what?
14  A. That you have to do some kind of a survey to
15  figure out what the industry standard is for handling
16  fees.
17  Q. I wasn't suggesting that you do. I'm trying to
18  find out what you mean by "industry standard."
19     Is industry standard what most people do? Or is
20  it imposed by some rule?
21  A. Well, in this case it's imposed by a rule.
22  Q. So an industry standard can be something that's
23  imposed by a rule?
24  A. Sure.
25  Q. And you're saying with regard to handling fees

Page 51

1  the industry standard is what the rule requires?
2  A. Yes.
3  Q. And the rule requires that the fees not be
4  unreasonable?
5     MR. SHAPIRO: Object to the form.
6     THE WITNESS: It requires that they not be
7  unreasonable. And by interpretation of FINRA, it
8  requires that it be related to their actual costs, yes.
9     BY MR. NOWAK: (Resuming)
10  Q. In your opinion?
11  A. Yes, sir.
12  Q. But there's nothing that actually says that in a
13  FINRA publication?
14     MR. SHAPIRO: Object to the form.
15     THE WITNESS: No, I don't agree.
16     BY MR. NOWAK: (Resuming)
17  Q. Okay. How would an introducing broker who was
18  charging a handling fee in excess of their direct and
19  actual costs charged to them by the clearing broker know
20  if the fee that they were charging was excessive?
21  A. How would the introducing firm know?
22  Q. Yes.
23  A. They're required to do a computation, a
24  calculation, an analysis which demonstrates the actual
25  costs.

Page 52

1  Q. So if it was in excess of the introducing firm's
2  actual cost, it would by your definition be unreasonable
3  and therefore excessive?
4  A. Yes.
5  Q. You made mention of "the then prevailing rate"
6  language in the Legent form, correct?
7  A. Yes.
8  Q. Let's look at that for a second. And it's in a
9  lot of different places in here. But where I found it --
10  the first place I found it was in part of Exhibit B in
11  paragraph 27 -- Exhibit B in your Exhibit No. 3.
12  A. You're testing me here.
13  Q. Maybe we can agree on what it says.
14  A. I can read it. That's okay. If I close my right
15  eye, I can read it.
16  Q. The easier place to read this actually is in your
17  report, which I'd forgotten. It's on page 6 of your
18  report. It's in larger font. It might be more
19  accessible.
20  A. Yes.
21  Q. See that?
22  A. Yes.
23  Q. And the bolded language -- you bolded the
24  language, correct?
25  A. I did, yes.

Page 53

1  Q. It says "I agree to pay such commissions and fees
2  at the then prevailing rate"?
3  A. Yes.
4  Q. So "the then prevailing rate" relates to both
5  commissions and fees in that sentence, correct?
6  A. Yes, sir.
7  Q. So what is the then prevailing rate for
8  commissions?
9  A. The then prevailing rate for commissions would be
10  the commissions that Newbridge is charging the customer.
11  Q. So then why wouldn't the then prevailing rate for
12  fees be the fees that Newbridge was charging the
13  customer?
14  A. Well, I was going to say that the then prevailing
15  rate -- I'm sorry -- commissions -- it says "at the then
16  prevailing rate." And I think that means what Newbridge
17  was charging currently, which has to comply with the
18  markup rule.
19  Q. Right.
20  A. To that extent, the industry standard is somewhat
21  circumscribe.
22  Q. Meaning it has to be under 5% of the cost of the
23  transaction as a general rule?
24  A. As a general rule, yes.
25     And then with respect to fees, again, I think the

Page 54

1  then prevailing rate talks about the rate, the actual
2  charges, that Newbridge incurs from the clearing firm.
3      Q. Plus whatever amount they might be able to
4  justify above that?
5          MR. SHAPIRO: Object to the form.
6          THE WITNESS: Yes.
7          MR. SHAPIRO: Could we take five minutes please?
8          MR. NOWAK: Sure.
9          (A recess was taken.)
10         BY MR. NOWAK: (Resuming)
11     Q. Just to finish up on the line of questioning we
12  were talking about with "the then prevailing rate"
13  language, did I understand you correctly to say that it
14  is your opinion that "the then prevailing rate" language
15  is rule-related, that it is interpreted in accordance
16  with the rule as opposed to what is occurring in the
17  industry -- the securities industry?
18         MR. SHAPIRO: Object to the form.
19         THE WITNESS: No.
20         BY MR. NOWAK: (Resuming)
21     Q. Tell me -- I thought you said that the then
22  prevailing rate in the securities industry didn't make
23  sense to you.
24     A. That's correct.
25     Q. So it's not the then prevailing rate in the

SPERLING & BARRACO, INC.

Page 55

1  securities industry based upon what people are doing --
2      A. That's not how I would interpret it. If you did
3  say that, then I would say the prevailing rate is the
4  actual cost.
5          I don't think you have to put that language in.
6  I don't think that's what that meant from my review of
7  other customer agreements over the years.
8          What that means to me is you agree to pay the
9  charge that we are charging. And it may vary. That
10  charge however is the cost of the transaction.
11         At least in this case it is reflected by the
12  actual charge of the clearing firm.
13     Q. So you don't have to refer to any industry
14  standard or to any rule to come to that interpretation?
15         MR. SHAPIRO: Object to the form.
16         BY MR. NOWAK: (Resuming)
17     Q. Is that what you're saying?
18     A. You have to refer to the rule.
19         Oh, you mean interpreting without the language of
20  "securities industry standard"?
21     Q. Right.
22     A. Yeah, I don't think you need that language.
23     Q. You say that you've reviewed a lot of customer
24  agreements in your career with FINRA.
25     A. Yes.

SPERLING & BARRACO, INC.

Page 56

1      Q. Did you see any other contracts with "the then
2  prevailing rate" language in it other than the Legent
3  form?
4      A. Not that I can recall.
5      Q. Have you seen other customer agreements in which
6  Legent was the clearing firm?
7      A. Possibly. But I don't recall.
8      Q. So you wouldn't be able to tell from your memory
9  what those introducing brokers for those customers were
10  doing with regard to handling fees?
11     A. No.
12     Q. And Rule 2430 doesn't only apply to handling
13  fees? It applies to all fees?
14     A. Yes, sir.
15     Q. Bear with me here. I'm about to wrap this up.
16         I believe you said that you have reviewed
17  Mr. Paulukaitis's report?
18     A. Yes.
19     Q. Is there anything in it that you particularly
20  take issue with?
21     A. Yes.
22     Q. What's that?
23     A. May I look at the report?
24     Q. Sure.
25     A. For the reasons I stated before, I don't agree

SPERLING & BARRACO, INC.

Page 57

1  that FINRA did not say that the handling charges have to
2  be directly related to their actual costs.
3          I disagree. FINRA never said that. We've talked
4  about it a lot this morning. Obviously I disagree with
5  that.
6      Q. Right.
7      A. He disagrees with my definition of "then
8  prevailing rate" obviously for the reasons we've talked
9  about. I disagree with that.
10     Q. Okay.
11     A. He says that in the FINRA AWC with Newbridge --
12     Q. Which page are you reading?
13     A. Page 9.
14         He says that the AWC "included no finding that
15  the handling fees charged by Newbridge were excessive."
16         I disagree with that for the reasons we've
17  discussed this morning.
18         And he says "Rather, FINRA found that Newbridge
19  had failed to accurately describe the fees."
20         They did find that in addition to in my view that
21  the charges were excessive.
22         He talks about when he was employed with FINRA
23  and how they went about their examinations. And he talks
24  about how handling fees were folded in with commissions
25  to determine whether commissions were excessive or

SPERLING & BARRACO, INC.

Sperling & Barraco, Inc.
www.sperlingandbarraco.com

(14) Pages 54 - 57

Page 58

1  markups were excessive.
2    Q. Right.
3    A. And he says "Examiners were not required to
4  separately evaluate the fairness of the amount of the
5  'handling fees' themselves or to compare them against a
6  purported industry standard."
7        I have no reason to disbelieve that. I think
8  that's true.
9        But the point here is just because FINRA wasn't
10 focused -- wasn't focused on this particular area at some
11 point in the past, it is not really relevant to this
12 case. The fact that they didn't focus on it doesn't mean
13 that the problems weren't there.
14       The way the examinations were conducted, the
15 examiners were given exam modules that had -- there's a
16 whole bunch of modules that they had to follow.
17       When they went to a particular firm, if they
18 didn't do a certain kind of business, they'd take out
19 that module. They wouldn't do that module. Like if they
20 didn't do an options business, they wouldn't do the
21 options.
22   Q. Right.
23   A. So they were required to follow each module and
24 there were questions under each one and things to fill
25 out.

SPERLING & BARRACO, INC.

Page 59

1    Q. Right.
2    A. And I believe that back then when I was there and
3  when Mr. Paulukaitis was there -- I believe what he's
4  saying is the modules probably didn't address this issue.
5        I have no reason to disagree with that. However,
6  it only means that FINRA was not focused on that area at
7  that point in time.
8    Q. When did they start to focus on that?
9    A. It looks like it was in 2011 when they brought
10 the five cases and issued the release.
11       And I think they indicated in one document -- I
12 think it was some kind of letter that FINRA sends out on
13 an annual basis that tells a member firm what they're
14 going to focus on this year, new areas to focus on. And
15 I believe this was one of the areas they indicated they
16 were going to focus on.
17       Let's see what else is here. He says the
18 prevailing rate is not an objective standard.
19       I think it is.
20       He says the prevailing rate -- he says it is not
21 true that prevailing rate relates to the direct and
22 actual costs incurred by a broker dealing with an
23 effective transaction.
24       For the reasons again this morning, I think he
25 can say that. FINRA said that.

SPERLING & BARRACO, INC.

Page 60

1        He seems to imply that there was some disclosure
2  of the handling fees. I assume he's referring to the fee
3  schedule and that that somehow cures this. And it
4  certainly does not.
5        The fee schedule, first of all, is very general.
6  And the one I looked at said -- I believe it said that
7  you can charge up to, I think it was, $49.95 or $59.95.
8        But it didn't delineate which office charged
9  which fee. So I don't think that disclosure was --
10   Q. Each handling fee was disclosed with regard to
11 each transaction on the confirmation statement, correct?
12   A. Yes, sir.
13       In essence, it's nice that they disclosed the
14 fee. But the fact is that the fee was excessive. And
15 you can't cure through disclosure violations the rules --
16 FINRA rules.
17   Q. Is that with regard to Mr. Paulukaitis's report?
18   A. Yes.
19       MR. NOWAK: Okay. I have no other questions.
20       EXAMINATION BY COUNSEL FOR PLAINTIFFS
21       BY MR. SHAPIRO:
22   Q. I have just a few areas I want to follow up on.
23       Earlier in the day do you recall that Mr. Nowak
24 was asking you questions regarding to what extent, if
25 any, it would be permissible for Newbridge to add certain

SPERLING & BARRACO, INC.

Page 61

1  charges to the handling fee that are charged to customers
2  on top of the clearing house charge? Do you recall that
3  line of questioning?
4    A. Yes.
5    Q. I just want to make sure I'm clear on what your
6  opinion is on that.
7        Am I correct that your opinion is that, to the
8  extent that an introducing firm such as Newbridge could
9  show that they incurred actual costs that were directly
10 related to the transactions that were processed by the
11 clearing firm, then there could be a scenario where the
12 amount of the handling fee could exceed the clearing firm
13 charge?
14       MR. NOWAK: Object to the form.
15       THE WITNESS: Not the clearing firm charge.
16       The amount charged by Newbridge -- say it again.
17       BY MR. SHAPIRO: (Resuming)
18   Q. Let me start over.
19   A. I can just tell you what I think.
20   Q. Well, let me do it this way.
21       If a firm like Newbridge, an introducing firm,
22 could show that it incurred actual and direct costs
23 associated with processing a particular transaction, it's
24 your opinion that those costs could be added to the cost
25 charged by the clearing firm in processing the

SPERLING & BARRACO, INC.

Page 62

1  transaction; is that correct?
2  A. Yeah, as long as -- as long as they can document
3  the method by which they arrived at the calculation of
4  the additional cost.
5  Q. Okay.
6  A. It has to be related to the transaction and it
7  has to be properly categorized.
8  Q. Okay. Because the part that confused me a little
9  bit was there was some phraseology that was used in your
10 discussion with Mr. Nowak where I think it was the term
11 "general costs that were reasonably related." And that
12 phraseology confused me a little, so I want to make sure
13 we're clear.
14      The only way the handling fee could exceed the
15 clearing house charge is if Newbridge could demonstrate
16 that there were specific direct actual costs that it
17 incurred on top of the clearing charge?
18 A. Yes.
19     MR. NOWAK: Object to the form.
20     THE WITNESS: Yes.
21     BY MR. SHAPIRO: (Resuming)
22 Q. And based upon your review of the record and the
23 deposition testimony and everything that you've seen in
24 this case, do you have an opinion whether Newbridge has
25 demonstrated that it was permissible for it to add any

SPERLING & BARRACO, INC.

Page 63

1  fees on top of the cost charged by the clearing firm?
2  A. No.
3      Mr. Spitler testified that these charges were
4  negotiated between the rep or the office and Newbridge --
5  I'm sorry. What was the question?
6  Q. Based upon your review of the record in this
7  case, including the deposition testimony, do you have an
8  opinion as to whether it was permissible for Newbridge to
9  add any dollar amount above the clearing house charge in
10 charging its customers a handling fee?
11 A. No, there's no evidence to that effect.
12     Mr. Spitler testified that these charges were not
13 related to anything, they were not calculated based on
14 any actual cost, and that they were were purely a
15 negotiation for additional compensation.
16     So the answer to the question is no. I mean,
17 yes, I have an opinion. But it's no.
18     MR. SHAPIRO: I hear you. And that's all I have.
19 FURTHER EXAMINATION BY COUNSEL FOR DEFENDANT
20     BY MR. NOWAK:
21 Q. I have one followup question as a result of your
22 followup question.
23     Is there any rule, regulation, or official FINRA
24 or other regulatory promulgated publication that says
25 that the amount that an introducing firm is allowed to

SPERLING & BARRACO, INC.

Page 64

1  charge as a handling fee over and above the clearing
2  broker's charge to them is limited to direct and actual
3  costs?
4  A. Other than the documents we discussed this
5  morning, no.
6  Q. And the documents we discussed this morning are
7  the --
8  A. The release involving the actions against five
9  brokers and the AWCs themselves.
10 Q. Newbridge's AWC?
11 A. Newbridge's and the other ones that I looked at.
12     MR. NOWAK: That's it.
13 FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFFS
14     BY MR. SHAPIRO:
15 Q. One followup.
16     These documents you just referred to were
17 predicated on NASD Rule 2430, correct?
18 A. "These documents," being what?
19 Q. These releases from FINRA that you just
20 referenced, the documents which publicized the action by
21 the five firms, the consent order entered by Newbridge.
22     Those documents reference and were predicated
23 upon NASD Rule 2430, at least in part?
24 A. In part, yes.
25 Q. And NASD 2430 has been a rule that has been in

SPERLING & BARRACO, INC.

Page 65

1  effect and operative prior to 2008?
2  A. Oh, yes. It's been there for a long, long time.
3  Q. And the language of the rule hasn't changed at
4  any point from 2008 forward?
5  A. No, I don't believe so.
6  Q. And you're not aware of any FINRA publication or
7  a publication from any institution which would support
8  the concept that a handling fee can exceed the direct and
9  actual costs associated with processing the transaction?
10 A. There's nothing to say it can exceed, no.
11 Q. You've never seen anything that says you can
12 exceed it?
13 A. No.
14    MR. NOWAK: Can or can't?
15    THE WITNESS: No.
16    BY MR. SHAPIRO: (Resuming)
17 Q. We talked about things that said it can't, right?
18 A. Yes.
19    MR. NOWAK: Other than what you testified about?
20    THE WITNESS: Other than what I've testified, I'm
21 not aware of anything else.
22    MR. NOWAK: Okay. Got it.
23    BY MR. SHAPIRO: (Resuming)
24 Q. Is it clear to you that NASD Rule 2430 prohibits
25 the markup of handling fees beyond the direct and actual

SPERLING & BARRACO, INC.

Page 66

1  costs associated with processing the transaction?
2  A. Yes.
3      MR. NOWAK: I have no other questions.
4      MR. SHAPIRO: That's all.
5      MR. NOWAK: You have the right to read the
6  deposition transcript for accuracy or you can waive that
7  right. You just have to let the court reporter know now
8  which it is you choose to do.
9      MR. SHAPIRO: We'll read it.
10     (Whereupon, at 11:54 o'clock a.m., the hearing in
11  the aforesaid matter was concluded.)

SPERLING & BARRACO, INC.

Page 67

1  STATE OF NORTH CAROLINA )
2  COUNTY OF BUNCOMBE      )
3       I, GENEVIEVE R. BATA-SLAGLE, a notary public in
4  and for the State of North Carolina, do hereby certify
5  that on October 23, 2013, there appeared before me,
6  pursuant to notice, GENE ERIC CARASICK, as a witness in
7  the above cause; that the appearances were as shown in
8  the caption hereof; that the said deposition was taken at
9  the time and place indicated;
10      That the said witness was sworn by me to tell the
11 truth, the whole truth, and nothing but the truth in said
12 cause; that the foregoing testimony was taken by me in
13 stenotype and thereafter reduced to typewriting by me,
14 and the foregoing deposition is a true record of the
15 testimony given by the witness; that the reading and
16 signing of the deposition by the witness were not waived;
17      That I am not of kin or in anywise associated
18 with any of the parties to said cause or their counsel
19 and that I am not interested in the event thereof.
20      This the _____ day of _____,
21 2013.
22
23                  _____
24                  GENEVIEVE R. BATA-SLAGLE
                    Notary Public #20032480039
25

SPERLING & BARRACO, INC.

Page 68

SIGNATURE PAGE

    I, GENE ERIC CARASICK, have read the foregoing pages of testimony given by me on October 23, 2013, in Asheville, North Carolina.

    This testimony should be corrected as follows:

PAGE     LINE          CORRECTION AND REASON THEREFOR

    Subject to the foregoing corrections, my testimony is as contained in the foregoing deposition.

    SIGNED at _____,
this _____ day of _____, 2013.

                    _____
                    GENE ERIC CARASICK

Subscribed and sworn to before me
this _____ day of _____, 2013.

                    _____
                    NOTARY PUBLIC
My commission expires:
_____

SPERLING & BARRACO, INC.