# Exhibit "C"

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## FT. LAUDERDALE DIVISION

### CASE NO. 13-CV-60384-COHN-SELTZER

RICHARD REMINGTON and URSULA
FINKEL, on their own behalf and on behalf
of those similarly situated,

        Plaintiffs,

vs.

NEWBRIDGE SECURITIES CORPORATION,

        Defendant.

_____/

## DECLARATION OF DAVID PAULUKAITIS

    I state under penalty of perjury under the laws of the United States of America that the

attached Independent Expert Report is true and correct.

    Dated this __29__ day of October, 2013.


                       _____
                       DAVID PAULUKAITIS

6255695.1





CAPITAL MARKETS
CONSULTANTS, INC.

# Independent Expert Report

David E. Paulukaitis, Managing Director
Mainstay Capital Markets Consultants, Inc.

Richard Remington and Ursula Finkel, et al.
v.
Newbridge Securities Corporation

United States District Court
Southern District of Florida
Case No.: 13-60384-CIV-Cohn-Seltzer

October 15, 2013

Independent Expert Report                                          October 15, 2013
Remington and Finkel v. Newbridge Securities Corporation

My name is David E. Paulukaitis and I am a Managing Director with Mainstay Capital Markets Consultants, Inc. ("Mainstay"), located at 1040 Crown Pointe Parkway, Suite 840, Atlanta, Georgia, 30338. I have been retained by Newbridge Securities Corporation ("Newbridge") to testify on its behalf in conjunction with a putative class action lawsuit initiated by Richard Remington and Ursula Finkel ("Plaintiffs") against Newbridge.

The *Second Amended Class Action Complaint* (the "*Complaint*") filed in this matter alleges, in substance, that certain "handling fees" charged by Newbridge in conjunction with securities transactions effected for the Plaintiffs were excessive and unreasonable, constituted a breach of contract, and amounted to negligence on behalf of Newbridge.

## Background and Qualifications

Mainstay provides compliance consulting services to securities brokerage firms ("broker/dealers") and registered investment advisers. In my capacity with Mainstay, I provide a variety of consulting services, principally to broker/dealers, focusing on regulatory compliance in the areas of supervision, supervisory controls, and internal compliance systems. I additionally provide consulting services regarding a variety of other areas such as research, investment banking, anti-money laundering compliance, general sales practices and regulatory inquiries and investigations. In that regard, I frequently provide guidance to broker/dealers relative to securities industry rules and regulations and the steps necessary to comply with them.

In addition to my responsibilities with Mainstay, I serve as an expert witness (for both Claimants and Respondents) in securities arbitrations and litigation, provide consulting services to state securities regulatory authorities in support of their investigative and enforcement programs, and serve as an independent consultant in conducting mandated undertakings associated with regulatory enforcement proceedings against broker/dealers initiated by the Financial Industry Regulatory Authority ("FINRA"), state securities regulatory authorities, and the Securities and Exchange Commission ("SEC"). I have also served as an expert witness in conjunction with Administrative Proceedings initiated by the Division of Enforcement of the SEC (both on behalf the SEC and on behalf of Respondents), FINRA, the Chicago Board Options Exchange, and various state regulatory authorities.

1

Independent Expert Report                                          October 15, 2013
Remington and Finkel v. Newbridge Securities Corporation

Prior to my association with Mainstay, I was employed for 23 years with the National Association of Securities Dealers, Inc. ("NASD"), the predecessor of to FINRA.[1]  Like FINRA, NASD was responsible for regulating the activities of broker/dealers.  As more fully described in Exhibit 1, I was employed as an Examiner, a Supervisor of Examiners, and an Associate District Director in NASD's Atlanta District Office and was directly involved in ensuring that broker/dealers operated in compliance with applicable securities industry rules and regulations.

### Testimony and Expert Experience

During my employment with NASD, I testified as a staff witness in numerous disciplinary proceedings.  Those matters dealt with a wide variety of regulatory compliance issues, most of which centered on sales practices and supervision.  Those matters involving supervision included testifying regarding the adequacy of supervisory systems and procedures and the adequacy of specific supervisory functions performed.  Since joining Mainstay, I have testified on a number of occasions in arbitration proceedings, in a civil litigation proceeding, in state enforcement matters, in a Chicago Board Options Exchange proceeding, in a FINRA enforcement proceeding, and in SEC Enforcement proceedings.  A list of these matters is attached as Exhibit 2 to this report.

### Prior Engagements with Newbridge

I have been retained by Newbridge on two prior occasions to serve as an expert witness.  I was first retained in conjunction with an SEC Administrative Proceeding against Newbridge and its two former senior officers alleging that those officers had failed reasonably to ensure that supervisory duties they had delegated to others were being reasonably carried out.  I was subsequently retained by Newbridge in conjunction with an arbitration claim filed by a former customer.  That matter involved the reasonableness of the supervision of a former registered representative by Newbridge.

Prior to the two matters noted above, I performed a limited amount of consulting work for Newbridge.  Most of the consulting work I did involved

---

[1]  FINRA was established in mid-2007 through the combination of NASD and NYSE Regulation, Inc. (the regulatory arm of the New York Stock Exchange).

reviewing specific documents or procedures, or responding to compliance-related questions. The only substantive work I did for Newbridge was conducting a review of the structure of Newbridge's compliance department in 2006 and conducting Newbridge's anti-money laundering testing for the years 2006 and 2007. The last consulting work I did for Newbridge was in early 2009.

The consulting work I did for Newbridge was billed at my then current billing rate of $200 per hour. My services as an expert witness in the SEC proceeding and the 2011 arbitration were billed at my expert witness billing rate of $295 per hour. This specific engagement is similarly being billed at $295 per hour.

## Evidence Reviewed

In conjunction with my engagement in this matter, I have reviewed the *Complaint*, Newbridge's *Motion to Dismiss*, copies of discovery requests exchanged between the parties, and a variety of additional relevant documents, including:

- The report of Plaintiff's expert Gene E. Carasick;
- The *Letter of Acceptance, Waiver & Consent* entered into between Newbridge and FINRA (executed by Newbridge on January 22, 2013);
- The *Consent Order* entered into between Newbridge and the Department of Banking for the State of Connecticut (executed by Newbridge on October 18, 2011);
- The *Consent Order* entered into between Newbridge and the Bureau of Securities of the State of New Jersey (executed by Newbridge on January 29, 2013);
- The *Stipulation and Consent Agreement* entered into between Newbridge and the Florida Office of Financial Regulation (executed by Newbridge on February 1, 2013);
- The *Consent Order* entered into between Newbridge and the Arkansas Securities Commissioner (executed by Newbridge on April 2, 2013);
- The transcripts of the depositions of Plaintiffs Remington and Finkel, and their related exhibits; and
- The transcript of the deposition of Robert Spitler, President of Newbridge, and its related exhibits.

In addition, I reviewed the following:

- A FINRA press release dated September 7, 2011 announcing enforcement action against five broker/dealers for improper "handling fees;"
- Copies of the *Letters of Acceptance, Waiver & Consent* entered into between FINRA and the following five broker/dealers referenced in FINRA's September 7, 2011 press release:
    - Pointe Capital, Inc. (No. 2009015974701);
    - John Thomas Financial (No. 2009016304801);
    - First Midwest Securities, Inc. (No. 2009016348801);
    - A&F Financial Securities, Inc. (No. 2009016292001); and
    - Salomon Whitney LLC (No. 2010022181901);
- NASD Conduct Rules 2110, 2430 and 2440;
- NASD Information Memorandum-2440-1;
- FINRA Rule 2010;
- NASD Notices to Members 75-65, 79-7, and 92-11; and
- FINRA Regulatory Notices 11-08 and 13-07.

## Summary of Opinions

If called upon to testify in conjunction with this matter, I expect to offer the following opinions:

- NASD Conduct Rule 2430 requires that charges assessed by broker/dealers be reasonable.  Neither FINRA nor its predecessor, NASD, however, has ever established a specific baseline against which the reasonableness of charges should be assessed.
- As it pertains to transaction-related fees, neither FINRA nor NASD has ever suggested that the amount of such fees must be limited to the actual and/or direct charges associated with the execution and clearing of the transaction.
- FINRA's examinations addressing compliance with NASD Conduct Rule 2430 have focused on the adequacy and accuracy of the descriptions of the fees assessed by broker/dealers, not the amount of those fees.

- There is no securities industry standard established for evaluating whether the fees charged by a broker/dealer in conjunction with transactions it effects on behalf of its customers are reasonable. The amount of fees charged—to the extent fees are charged at all—are determined by each individual broker/dealer and are not dependent on the amounts charged by other broker/dealers.

## Opinions

*Regulatory Guidance Regarding Fees*

Broker/dealers are primarily compensated for executing securities transactions for their customers by charging commissions (if a transaction is done on an agency basis[2]) or markups/markdowns (if a transaction is done on a principal basis[3]). The amount of commissions (or markups/markdowns) that can be charged by a broker/dealer is governed by NASD Conduct Rule 2440, which states, in relevant part, that a broker dealer:

> shall not charge his customer more than a fair commission or service charge, taking into consideration all relevant circumstances, including market conditions with respect to such security at the time of the transaction, the expense of executing the order and the value of any service he may have rendered by reason of his experience in and knowledge of such security and the market therefor.

---

[2] When a broker/dealer effects a transaction on an agency basis, it acts as the customer's agent in submitting that transaction (whether a buy or a sell) to the appropriate marketplace. For this service, the broker/dealer charges a commission which is disclosed on the confirmation of the transaction that is sent to the customer.

[3] When a broker/dealer effects a transaction on a principal basis, it effects the transaction against its own proprietary account. Thus, a customer buying securities, for example, will purchase them from an account of the broker/dealer. The price the customer pays for the securities will include a markup over the current market price (which may be more or less than the broker/dealer's cost of purchasing those shares). Conversely, a customer selling securities will receive a price that includes a markdown from the current market price of the securities. Generally for equity securities, broker/dealers are required to identify on transaction confirmations the amount of the markup/markdown from the market price for the securities being purchased or sold.

FINRA provides additional guidance on this subject in Information Memorandum (IM)-2440-1, referred to as FINRA's "5% Policy," which essentially states that markups/markdowns and commissions should generally not exceed five percent of the amount of the transaction.[4]

Broker/dealers are permitted by FINRA to separately charge customers for the services they provide. NASD Conduct Rule 2430 establishes that the amount of any such charges "shall be reasonable and not unfairly discriminatory between customers." Unlike Rule 2440 and IM-2440-1, Rule 2430 does not establish any specific thresholds for evaluating whether charges are reasonable in any particular circumstance, nor does it set forth how the amounts of particular charges should be calculated. Indeed, FINRA (and NASD before it) has never specified the kinds of charges that can be imposed by a broker/dealer, the amounts of those charges, or how those charges should be calculated.

To illustrate this point, in October 1975, NASD issued Notice to Members 75-65 reminding broker/dealers of their duty to deal with customers at fair prices, commissions and charges. In that Notice, NASD stated:

> Although Association rules do not specify or delineate exactly how a member may establish its commissions, markups or charges, they require that they must be fair under the relevant circumstances and a member should be prepared to justify that its prices are fair as to each customer and transaction.

Even today, FINRA does not establish specific standards for the amounts of fees or how they are determined. As explained in Regulatory Notice 13-07, FINRA has proposed replacing NASD Conduct Rule 2430 with proposed FINRA Rule 2123. That proposed Rule would require broker/dealers to create schedules of the charges and fees they assess. The proposed Rule would not, however, set forth the amounts of those fees or how they should be determined.

The guidance FINRA (and NASD before it) has provided to broker/dealers over the years regarding fees has focused on the disclosure of those fees to customers. For example, in 1979, NASD issued Notice to Members 79-7 which

---

[4] IM-2440-1 notes that the 5% Policy is a guide and that markups/markdowns or commissions greater than or less than five percent could be deemed excessive depending on all of the relevant facts associated with a particular transaction.

provided broker/dealers with a copy of a release from the SEC entitled "Fair Treatment of Customer Accounts." One of the subjects of this release was the imposition by broker/dealers of custodial fees for inactive customer accounts. Specifically, the release stated:

> It has also been reported to the Commission that a number of broker-dealers have recently imposed charges for custodial services on inactive accounts without giving adequate advance notice to enable customers to consider closing or transferring their accounts. The Commission believes that this practice is also inconsistent with a broker-dealer's obligation to deal fairly with its customers and inconsistent with just and equitable principles of trade.

Nowhere in the release did the SEC identify the amount of the custodial fee that it deemed reasonable. Similarly, nowhere in Notice to Members 79-7 did NASD identify the amount of the custodial fee it deemed reasonable. Instead, the emphasis of the Notice to Members was on the prior disclosure to customers of the fees to be charged, such that customers could consider closing or transferring their accounts if they were unwilling to pay fees in the amounts assessed by a particular broker/dealer.

NASD again revisited the issue of fees and charges when it issued Notice to Member 92-11 in February 1992. Like Notice to Members 79-7, its emphasis was on the prior disclosure of fees and charges (in this case, relating to account transfers). Nowhere in the Notice did NASD address the amount of the charges to be assessed or how those charges should be determined.

### Newbridge's Disclosure of Fees to Plaintiffs

It appears to be undisputed that during the time period subject to the matters at issue in this litigation Newbridge maintained a fee schedule that set forth the various charges it imposed, including the "handling fee" charged on individual transactions. Plaintiffs Remington and Finkel both stated that they did not recall receiving the fee schedule but neither denied receiving it.[5]

---

[5] See the *Response and Objections to Defendant's First Set of Interrogatories* for Remington and Finkel. See also Mr. Remington's deposition transcript at page 5 and Mrs. Finkel's deposition transcript at page 7.

7

Whether or not they recall receiving the fee schedule, the Plaintiffs do not dispute that the dollar amount of the "handling fee" was disclosed on every trade confirmation they received, that they saw those fees on each confirmation, and that they had no objection to those fees.[6]  Thus, they were certainly afforded the opportunity to object to the fees and, as the SEC noted in its 1979 release, given the opportunity to close or transfer their accounts if they were unhappy with the fees they were charged.

The Plaintiff's also acknowledge that Newbridge's *Customer Agreements* in effect from June 1, 2008 through the present contain a provision that states:

> I understand that there are charges for commissions and fees for executing buy and sell orders and for other services provided under this agreement.  I agree to pay such commissions and fees at the then prevailing rate.[7]

Plaintiffs contend that the reference to the phrase "then prevailing rate" is "reflective of an average, reasonable amount charged in the industry" and that "the prevailing rate in the industry for handling fees was the amount of the direct and actual costs that were incurred by the brokerage firm on behalf of the customer in processing the transaction."[8]  Similarly, Plaintiff's expert Carasick opined that "the term 'then prevailing rate' is subject to only one definition: Newbridge's direct and actual handling cost as determined by the rate Newbridge is charged by its clearing firm."[9]  I disagree for several reasons.

First, Plaintiff's expert Carasick opines that: "Newbridge was contractually obligated to charge its customers a handling fee in accordance with the prevailing rate in the securities industry."  He does not, however, identify what that purported prevailing rate is or how it is determined.  In point of fact, there is no such rate.  In my experience, the transaction-related fees charged by

---

[6] See Mr. Remington's deposition transcript at pages 5 and 6 and Mrs. Finkel's deposition transcript at pages 5 and 6.

[7] See *Complaint* at paragraph 32.

[8] See *Complaint*, paragraphs 33 and 34.

[9] See Carasick's expert's report, page 7.

broker/dealers are as widely varied as the names used to describe those fees.[10]
The manner in which the fees are calculated similarly varies widely. Some
broker/dealers assess a uniform flat fee, some assess a flat fee that is based on the
clearing charge associated with the transaction, some assess the fee using a
mathematical calculation that considers a variety of factors, and some charge no
fees at all. Indeed, in 2009, Newbridge polled a number of its competitors
regarding the fees they charged and the responses received evidenced the
diversity of those charges.[11]

The FINRA *Letter of Acceptance, Waiver & Consent* ("AWC")[12] entered into
by Newbridge in January 2013 pertaining to its fee charges included no finding
that the handling fees charged by Newbridge were excessive or that they were
otherwise inconsistent with a "prevailing rate" in the securities industry. Rather,
FINRA found that Newbridge had failed to accurately describe the fees it
charged. Specifically, FINRA noted:

> By designating the charge as a handling fee on customer trade
> confirmations, Newbridge understated the amount of the total
> commissions charged by the Firm and misstated the purpose of
> the handling fee.

FINRA's action against Newbridge was consistent with the actions it took
against five other broker/dealers in September 2011. In those five instances (all of
which were resolved through AWCs), FINRA found that each firm had
"mischaracterized a portion of the commission charges as fees for handling
services." As FINRA explained in a press release announcing the five actions:

> the handling fees were designed to serve as a source of
> additional transaction based remuneration for the firm and thus

---

[10] Some of the common names for these fees that I have seen in the course of my career include
"postage and handling," "handling fee," "miscellaneous fee," "administrative fee," and "ticket
charge."

[11] See Bates Nos. NB 001232-NB 001234.

[12] Under an AWC, a Respondent accepts the finding of one or more rule violations without
admitting or denying the violation(s), consents to a sanction, and waives the right to the formal
hearing process.

were in excess of the cost of the handling-related services the firms provided.

As with the action against Newbridge, none of these five disciplinary actions suggested that the fees charged were themselves excessive or otherwise inconsistent with some sort of industry standard.

The imposition of fees on customer securities transactions by broker/dealers began to become commonplace while I was employed by NASD and it was an area that was reviewed in conjunction with our examinations of broker/dealers.  This review was done as part of the evaluation of the fairness of commission charges.  Examiners were required to add the dollar amount of "handling fees" with the dollar amount of commissions charged and to treat that sum as the total commission assessed on each transaction.  That amount was then used in determining whether the total commission was consistent with the requirements of NASD Conduct Rule 2440 and IM-2440-1.  Examiners were not required to separately evaluate the fairness of the amount of the "handling fees" themselves or to compare them against a purported industry standard.

The Newbridge AWC and the AWCs entered into by the five other broker/dealers noted above all indicated that the "handling fees" were treated by FINRA as additional commissions received by those firms.  Despite this, none of those matters found that the total commissions charged to customers were excessive.

A second reason I disagree with the Plaintiffs' interpretation of the term "prevailing rate" is how that term is used in the Newbridge *Customer Agreement*. The *Customer Agreement* applies the term not just to fees but also to commissions. In fact, the sentence immediately following the language cited by the Plaintiffs reads: "I acknowledge that ***the prevailing rate of commissions and fees*** may change…" (emphasis added).  If, as the Plaintiffs suggest, the "prevailing rate" of fees is "an objective standard, reflective of an average, reasonable amount charged in the industry," then the same standard must be applied to commissions that are charged.  As noted above, the guidance provided by FINRA relative to commission charges is that commissions can range as high as five percent (or, in some instances, more) of the dollar amount of the transaction. If the "prevailing rate" as defined by the Plaintiffs were to be equally applied to commissions, then the fairness of a commission charged by a broker/dealer would have to be evaluated based on how closely it correlates with the

commissions charged by all other broker/dealers.  That is a completely unrealistic and unworkable proposition.

A third reason I disagree with the Plaintiffs' interpretation of the term "prevailing rate" relates to their contention (and the contention of their expert) that any "handling fee" applied by a broker/dealer must be representative of the "direct and actual cost" incurred by a broker/dealer to effect that transaction. This contention has no basis in fact.  Neither FINRA, the SEC, nor any other recognized authority has provided any such guidance or direction.  Additionally, this contention erroneously presumes that the charges imposed by clearing firms for processing transactions are uniform (they are not) and that introducing firms incur no costs themselves in conjunction with processing transactions.  As Robert Spitler, President of Newbridge pointed out in his deposition, broker/dealers incur a variety of expenses associated with the transactions they effect, including operational, compliance, accounting and technology.[13]

It is noteworthy that while NASD and FINRA have provided specific guidance to broker/dealers regarding the amount of commissions and markups/markdowns that are deemed fair and reasonable, no similar guidance is provided regarding fees.  NASD and FINRA could both have amended Rule 2430 to provide such guidance if in fact there were "an objective standard, reflective of an average, reasonable amount charged in the industry."  No such amendment has ever been formally proposed or adopted.

## Conclusions

Newbridge imposed "handling fees" on customer transactions that FINRA, as Newbridge's primary regulator, concluded were not adequately or accurately explained.  FINRA did not, however, conclude that those fees were excessive or that the fees themselves violated NASD Conduct Rule 2430.  FINRA similarly did not find that the fees were inconsistent with some purported securities industry standard, likely because no such standard exists.

FINRA did conclude that the fees in question constituted additional compensation to Newbridge and should be considered as such.  Even then, FINRA made no finding that adding the fee to the commission charged on

---

[13]  See Mr. Spitler's deposition transcript at pages 127-128.

**Independent Expert Report**                                        October 15, 2013
**Remington and Finkel v. Newbridge Securities Corporation**

individual transactions resulted in commission charges that were excessive, in violation of NASD Conduct Rule 2440 and IM-2440-1.

The "handling fees" charged by Newbridge were, however, disclosed to customers in advance, were reflected on every transaction confirmation, were identified by the Plaintiffs when they received their transaction confirmations, and were not objected to at any time by the Plaintiffs. The Plaintiffs were provided ample opportunity to object to the fees charged them and, at their discretion, to take their securities business to another broker/dealer whose fee structure was more to their liking. Both Plaintiffs ultimately did transfer their accounts, but not as a result of the fees they were charged.

I reserve the right to modify, supplement, or otherwise amend this report and the opinions expressed herein should I be provided with any additional documentation or information regarding this matter.

### Mainstay Capital Markets Consultants, Inc.

_____

David E. Paulukaitis
Managing Director

12

individual transactions resulted in commission charges that were excessive, in violation of NASD Conduct Rule 2440 and IM-2440-1.

The "handling fees" charged by Newbridge were, however, disclosed to customers in advance, were reflected on every transaction confirmation, were identified by the Plaintiffs when they received their transaction confirmations, and were not objected to at any time by the Plaintiffs. The Plaintiffs were provided ample opportunity to object to the fees charged them and, at their discretion, to take their securities business to another broker/dealer whose fee structure was more to their liking. Both Plaintiffs ultimately did transfer their accounts, but not as a result of the fees they were charged.

I reserve the right to modify, supplement, or otherwise amend this report and the opinions expressed herein should I be provided with any additional documentation or information regarding this matter.

## Mainstay Capital Markets Consultants, Inc.

David E. Paulukaitis
Managing Director

12

Independent Expert Report                                           October 15, 2013
Remington and Finkel v. Newbridge Securities Corporation

## Exhibit 1

### David E. Paulukaitis
### NASD Employment Summary

I began my employment with NASD in January 1982 as an examiner, conducting routine examinations of broker/dealers, reviewing broker/dealer financial filings (such as FOCUS and annual audit reports), and processing the applications of entities seeking to register with NASD as broker/dealers. I additionally conducted investigations relating to investor complaints, the circumstances surrounding the termination of registration of registered representatives "for cause", and a variety of other matters involving alleged sales practice abuses.

In October 1985, I was promoted to Supervisor of Examiners and was assigned responsibility for overseeing the work of six examiners who conducted routine examinations and "cause" investigations, performed financial surveillance over NASD member firms, and processed new member applications. In June 1986, I was additionally assigned supervisory responsibility over the Atlanta District Office's "cause" investigation program.

In April 1994, I was promoted to Assistant District Director and became responsible for overseeing the routine examination, "cause" investigation, financial surveillance, and membership programs for the entire District Office (encompassing, at one point, a staff of 41 examiners and seven Supervisors of Examiners responsible for regulating more than 600 member firm broker/dealers). In April 1996, I was promoted to Associate District Director, retaining the same job responsibilities.

As an examiner and Supervisor with NASD, I personally participated in approximately 100 broker/dealer examinations involving the review of financial/operational and sales practice activities. I also personally conducted several thousand "for cause" investigations involving specific allegations of misconduct by broker/dealers and their registered representatives. As a Supervisor and Assistant/Associate Director, I reviewed several thousand more examinations and investigations and was responsible for recommending or approving/rejecting the disposition of those matters recommended by the senior examiners and Supervisors who reported to me. These matters involved

virtually every aspect of broker/dealer compliance, operations and supervision and virtually every kind of sales practice concern, including suitability and failure to supervise.

While serving as Assistant and Associate Director, I was also responsible for the District Office's member outreach program, which included planning and conducting annual compliance seminars, member firm meetings, and registered representative compliance training workshops.

While employed with NASD, I participated in a variety of national initiatives. Among other things, I served as an instructor in NASD's accredited examiner training program for ten years and participated in an assortment of national projects and committees, including serving as a member of the steering committee for NASD's Small Cap Examination Program, which oversaw a number of high profile examinations of broker/dealers engaged in abusive sales practices in the small cap securities market. I also participated as a member of the steering committees that created NASD's Cause Examination Procedures Manual and NASD's first automated examination tracking system.

In addition to the foregoing, I am one of a handful of two-time recipients of NASD's highest employee recognition award, the Excellence in Service Award.

Independent Expert Report                                        October 15, 2013
Remington and Finkel v. Newbridge Securities Corporation

## Exhibit 2

### David E. Paulukaitis
### Post-NASD Testimony and Expert Experience

**Arbitrations:**

In the past four years, I testified as an expert witness for the Respondents in the following matters:

> FINRA Case No. 09-01002, Freecharm Limited v. Atlas One Financial Group, Inc. (Allegations of unsuitable transactions and failure to supervise)

> FINRA Case No. 09-01961, Wayne Brown v. Wachovia Securities, Inc. (Allegations of unsuitable transactions and failure to supervise)

> FINRA Case No. 09-02085, Kin Lee and Fanny Ling Tsui v. TD Ameritrade, Inc. (Allegations of unsuitable transactions and failure to comply with day-trading regulations)

> FINRA Case No. 09-02365, Thomas Hillman v. UBS Financial Services, Inc. (Allegations of unauthorized and unsuitable transactions and violations of Regulation D)

> FINRA Case No. 09-03946, Pamela Koprowski v. H. Beck, Inc. (Allegations of failure to supervise and misrepresentation of facts on a Form U-5)

> FINRA Case No. 09-03961, Howard Wilkov v. Ameriprise Financial Services (Allegations of failure to supervise a registered representative who engaged in private securities transactions)

> FINRA Case No. 09-04321, Christine Monahan, et al., v. H. Beck, Inc. (Allegations of failure to supervise and misrepresentation of facts on a Form U-5)

15

FINRA Case No. 09-04491, James Olinkiewicz v. UBS Financial Services, Inc. (Allegations of failure to execute sell orders)

FINRA Case No. 09-05115, Mohan Selvardj v. thinkorswim, Inc. (Allegations of unsuitable transactions)

FINRA Case No. 09-05638, Peter Boltis v. Morgan Stanley Smith Barney, Inc. (Allegations of unauthorized transactions and unauthorized account transfer)

FINRA Case No. 09-06320, Maryellen Seely v. Morgan Stanley Smith Barney, Inc. (Allegations of failure to supervise)

FINRA Case No. 09-06863, Michael Muschio v. Ameriprise Financial, Inc. (Allegations of unsuitable transactions and failure to supervise)

FINRA Case No. 10-00481, Michael and Patricia Aberlich v. Intervest International Equities Corp. (Allegations of failure to supervise and failure to perform adequate due diligence)

FINRA Case No. 10-01816, Carolyn Gilson v. TD Ameritrade, Inc. (Allegations of failure to supervise the transmittal of funds)

FINRA Case No. 10-03084, John and Carolyn Smith v. Wells Fargo Advisors, LLC (Allegations of unsuitable transactions)

FINRA Case No. 10-03511, Christopher and Angela Allen v. thinkorswim, Inc. (Allegations of failure to supervise)

FINRA Case No. 10-03698, James K. Heiser v. Newbridge Securities Corp. (Allegations of unsuitable transactions and failure to supervise)

FINRA Case No. 10-04204, Bluegrass Corporation v. Santander Securities Corporation (Allegations of failure to supervise)

FINRA Case No. 10-04362, Emil Royers v. Edward Jones & Co. (Allegations of the failure of a broker to fulfill his duties to a customer)

FINRA Case No. 10-04741, Charlamagne Louis-Charles v. SunTrust Investment Services (Allegations of misrepresentation of facts on a Form U-5)

FINRA Case No. 10-04904, Caleb and Kathryn Batten v. Wachovia Securities, Inc. (Allegations of unsuitable transactions, failure to supervise, and elder abuse)

FINRA Case No. 10-05167, Carmine and Claudia Aufiero v. Triad Advisors, Inc. (Allegations of failure to supervise a registered representative who engaged in private securities transactions)

FINRA Case No. 10-05543, DeJohn Family LLP v. Commonwealth Financial Network (Allegations of failure to supervise and failure to perform adequate due diligence)

FINRA Case No. 10-05715, Janet E. Schmidt v. UBS Financial Services (Allegations of failure to supervise a registered representative who engaged in private securities transactions)

FINRA Case No. 11-00484, James and Linda Bordas v. Wells Fargo Advisors, LLC (Allegations of unsuitable transactions and failure to supervise)

FINRA Case No. 11-02023, Joel Hudson v. Edward Jones & Co. (Allegations of misrepresentation of facts on a Form U-5)

FINRA Case No. 11-02104, Janette Otero-Melendez v. PFS Investments, Inc. (Allegations of unsuitable investments and failure to supervise)

FINRA Case No. 11-02224, Robert R. Bennie, Jr. v. LPL Financial LLC (Allegations of misrepresentation of facts on a Form U-5)

FINRA Case No. 11-02623, Susan Myers, et al., v. Deutsche Bank Securities Inc. (Allegations of failure to supervise)

FINRA Case No. 11-02791, Matina Nimphie, et al., v. Raymond James Financial Services, Inc. (Allegations of failure to supervise)

17

Independent Expert Report                                                  October 15, 2013
Remington and Finkel v. Newbridge Securities Corporation

> FINRA Case No. 11-04256, Joseph Pappy v. TD Ameritrade, Inc.
> (Allegations of unsuitable transactions)

> FINRA Case No. 11-04660, Lenore Tepper, et al., v. UBS Financial Services,
> Inc. (Allegations of failure to supervise)

> FINRA Case No. 12-00130, Phillip and Angela Pollice v. Commonwealth
> Financial Network, Inc. (Allegations of unsuitable investments,
> failure to deliver prospectuses, mispricing of alternative
> investments, and failure to supervise)

> FINRA Case No. 12-01225, Susan Aranoff v. TD Ameritrade (Allegations
> of unsuitable transactions and failing to protect a senior investor)

In the past four years, I testified as an expert witness for the Claimants in
the following matters:

> FINRA Case No. 09-01847, Eric Howell v. Metlife Securities, Inc.
> (Allegations of misrepresentation of facts on a Form U-5)

> FINRA Case No. 10-00886, Thomas Anderson v. Fred Alger & Company
> (Allegations of misrepresentation of facts on a Form U-5)

> FINRA Case No. 12-00540, James Kern v. First Washington Corporation, et
> al. (Allegations of failure to supervise)

> FINRA Case No. 12-00803, Myrna Kanter, et al. v. Christopher Goslin
> (Allegations of unsuitable transactions)

> FINRA Case No. 12-01697, First Command Financial Services, Inc. v.
> James S. Agostini, et al. (Allegations of improper account transfers
> and violations of Regulation S-P)

## Litigation:

I testified as an expert on behalf of the defendants in the matter of Mark F.
Augusta v. Faegre & Benson, LLP, et al. (Case No. GIC 831613). This matter

18

involved allegations of legal malpractice in conjunction with the representation of the plaintiff in three securities arbitration proceedings.

## Regulatory Enforcement Matters:

*States:*

I testified as an expert on behalf of the Office of the Commissioner of Financial Institutions for the Commonwealth of Puerto Rico ("CFI") in its administrative proceeding (C02-V-023) against Brookstreet Securities Corp., Eddie A. Perez, Carmen R. Caro, et al. This matter involved allegations that a registered representative had effected unsuitable equities and options transactions on margin in the accounts of a number of investors.

I also testified as an expert on behalf of Peter Tust in an administrative proceeding initiated by the Florida Department of Insurance (Case No. 09-2344PL) concerning the suitability of certain transactions in equity indexed annuities.

I served as an expert witness on behalf of the Oklahoma Department of Securities in two enforcement matters (Oklahoma Department of Securities v. Wilbanks Securities, Inc., et al., ODS File No. 05-029 and Oklahoma Department of Securities v. Geary Securities, Inc., ODS File No. 09-141). The Wilbanks matter involved allegations that the broker/dealer had inadequate supervisory systems and that its principals had failed to adequately supervise the broker/dealer's registered representatives. The Geary matter involved allegations that the broker/dealer had conducted business in violation of its net capital requirement and had failed to cease conducting a securities business while failing to maintain its minimum net capital requirement. Both matters were settled prior to hearing.

I served as an expert witness on behalf of the Florida Department of Financial Services in an enforcement matter (*In the Matter of Kovack Securities, Inc.*). This matter, which involved allegations that the broker/dealer had violated applicable anti-money laundering requirements and had failed to implement reasonable supervisory systems, policies and procedures, was settled prior to hearing.

I served as an expert witness on behalf of the Respondent in an enforcement matter initiated by the Florida Office of Financial Regulation against Prime

Capital Services, Inc.   This matter, which involved allegations of a failure to supervise, was settled prior to hearing.

*FINRA:*

I served as an expert witness on behalf of the Respondent Tony Grey in conjunction with a FINRA enforcement proceeding brought against him (Case No. 20090160341) concerning alleged excessive markups in municipal securities.

*SEC:*

I served as an expert witness on behalf of the SEC's Division of Enforcement in conjunction with the following matters:

> SEC v. George A. Todt, et al., Civil Action 05-3697 PA (Allegations of stock manipulation)

> SEC v. Park Financial and Gordon Cantley, FL-2992 (Allegations of money laundering and the failure to establish and enforce adequate anti-money laundering procedures)

> SEC v. Thomas C. Bridge, James D. Edge and Jeffrey K. Robles, Administrative Proceeding File No. 3-12626[14] (Allegations of improper mutual fund market timing and the failure to adequately supervise that activity)

> SEC v. Advanced Equities, Inc., Dwight Badger and Keith Daubenspeck, Administrative Proceeding No. 3-15031 (Allegations of misrepresentation and failure to disclose material facts in conjunction with the sale of securities)

> SEC v. optionsXpress, et al., Administrative Proceeding No. 3-14848 (Allegations of executing short sales in violation of Regulation SHO and failed to supervise)

---

[14] My partner, Kenneth E. Newman, was designated as the SEC's expert and he testified at trial regarding this matter.  I was responsible for preparing the expert's report regarding this matter under Mr. Newman's direction.

Independent Expert Report                                        October 15, 2013
Remington and Finkel v. Newbridge Securities Corporation

I testified on behalf of the SEC's Division of Enforcement in conjunction with the following matters:

> SEC v. Theodore W. Urban, Administrative Proceeding File No. 3-13655 (Allegations of failure to supervise)

> SEC v. Angelica Aguilera, Administrative Proceeding File No. 3-14999 (Allegations of failure to supervise)

I also testified as an expert witness on behalf of Respondents in the following matters initiated by the SEC Division of Enforcement:

> SEC v. Newbridge Securities Corporation, Guy Amico and Scott Goldstein, Administrative Proceeding File No. 3-13099 (Allegations of failure by senior management to properly delegate supervisory authority to other officers of the firm)

> SEC v. J.P. Turner & Company, LLC, Administrative Proceeding File No. 3-13550 (Allegations of failure to establish adequate policies and procedures regarding Regulation S-P)

> SEC v. Prime Capital Services, Inc., Administrative Proceeding File No. 3-13532 (Allegations of failure to establish and enforce adequate supervisory procedures)

## CBOE:

I testified as an expert witness on behalf of Electronic Transaction Clearing in conjunction with an enforcement proceeding initiated by the Chicago Board Options Exchange ("CBOE").  That matter involved allegations that the broker/dealer had failed to fulfill its Customer Identification Procedures responsibilities under applicable anti-money laundering regulations.

## Regulatory Undertakings:

Mainstay and I were accepted as independent third-party consultants to conduct reviews and submit reports concerning various compliance and supervisory

21

systems of the broker/dealers named in the following regulatory enforcement matters:

> _NASD v. ViewTrade Securities, Inc._ (E072003014001)

> _NASD v. Synergy Investment Group, LLC_ (E3A20040356-03)

> Missouri Office of Secretary of State:   _In the Matter of World Group Securities, Inc._ (Case No. AP-06-48)

> _NASD v. MML Investor Services, Inc._ (EAF040134002)

> _FINRA v. Pinnacle Capital Markets LLC_ (AWC No. 2006006637101)

> Task Force of the North American Securities Administrators Association ("NASAA"):   _In the Matter of Stifel, Nicolaus & Company, Incorporated_

> Missouri Office of Secretary of State:   _In the Matter of Huntleigh Securities Corporation_ (Case No. AP-10-33)

> Administrative Consent Orders: _In the Matter of: Morgan Asset Management, Inc., Morgan Keegan & Company, Inc., and James C. Kelsoe, Jr._
> Alabama Securities Commission (2010-0016)
> Kentucky Department of Financial Institutions (10-PPC-0267)
> Mississippi Secretary of State Securities and Charities Division (S-08-0050)
> Securities Division of the State of South Carolina (08011)
> Tennessee Department of Commerce and Insurance (11-005)

> Rhode Island Department of Business Regulation: _In the Matter of MML Investors Services, LLC_, DBR No. 11-S-0114

### Other Relevant Activities

During my career (both with NASD and at Mainstay), I have participated as a speaker and/or panelist on a variety of securities industry conferences and seminars.   These conferences and seminars have been sponsored by organizations such as NASD, securities industry consulting companies, local

securities industry trade organizations, investor groups, broker/dealers and legal and accounting organizations.  I have additionally participated on a number of occasions as an instructor/panelist at the annual examiner training program sponsored by the North American Securities Administrators Association.

During my employment with NASD, I served as an instructor for ten years in NASD's accredited examiner training program and participated as a member of a variety of national committees and task forces responsible for establishing internal policies and procedures and for structuring and monitoring nationwide sales practice investigations.

*Publications*

As noted above, during my career I have participated as a speaker and as a panelist at a variety of securities industry conferences and seminars.  The outlines of the agenda from at least two of those events, which occurred during my employment with NASD, have been published on the internet by other panelists with whom I participated:

> "Recent NASD Examination Findings and Enforcement Actions" (by Jerry A. Isenberg and David E. Paulukaitis) National Regulatory Services Compliance Conference, Miami, Florida (April 2002).

> "Big Firms, Small Firms – When is "Enough" Supervision Enough?" (by William F. Reilly, Thomas Grady, Ben A. Indek, David Spinar, Paul Matecki, and David E. Paulukaitis) 19th Annual NASAA Examiner Training Program, Ft. Lauderdale, Florida (June 2003)

I have not independently authored any professional publications.  In February 2008, however, I co-authored a document entitled "Identifying and Preventing Securities Fraud" that was used by Marc S. Dobin, Esq. in conjunction with a presentation he made at a conference sponsored by the National Business Institute.